In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1509

EXODUS REFUGEE IMMIGRATION, INC.,

*Plaintiff-Appellee,*

*v.*

MICHAEL R. PENCE, in his official capacity as Governor of
Indiana, *et al.*,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Southern District of Indiana.
No. 1:15-cv-01858 — **Tanya Walton Pratt**, *Judge.*

ARGUED SEPTEMBER 14, 2016 — DECIDED OCTOBER 3, 2016

Before POSNER, EASTERBROOK, and SYKES, *Circuit Judges.*

POSNER, *Circuit Judge.* The State of Indiana appeals from
the grant of a preliminary injunction to a private agency
named Exodus that assists refugees, some of whom are Syrian refugees, the state's target.

The regulation of immigration to the United States, including by refugees (people who have fled their homeland,

and unable to return because of threat of persecution seek to relocate in a country in which they'll be safe), is a federal responsibility codified in the Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq.* That Act has been amended by the Refugee Act of 1980, which authorizes the President to determine, on the basis of "humanitarian concerns or … the national interest," how many refugees to admit each year. 8 U.S.C. § 1157(a)(2). The President fixed the number at 85,000 for fiscal year 2016, of whom at least 10,000 were to be persons coming to the United States from Syria, in recognition of the horrendous conditions in Syria resulting from that nation's civil war, now entering its sixth year.

Because of fear of terrorist infiltration—apart from the massive 9/11 terrorist attacks, Boston, New York, and San Bernardino (California) have been targets of terrorist attacks since 2001 by persons not born in the United States—all persons seeking to enter the United States as refugees are required to undergo multiple layers of screening by the federal government, following screening by the United Nations High Commissioner for Refugees, before they can be admitted to the United States. The process can take up to two years. Of course there can be no certainty that no terrorist will ever slip through the screen, elaborate though it is; for there has been terrorist infiltration of this country since 9/11 and there is a specific concern about Syrian refugees: many of them were born elsewhere, moved at some point to Syria, became caught up in the civil war there, sought to escape from that embattled nation in which hundreds of thousands of civilians have been killed, and are difficult to screen because little may be known about their life either in Syria or in their country of origin if different from Syria. (We'll refer to all of them as "Syrians," though many of them were only

transitory residents of Syria.) The governor of Indiana believes, though without evidence, that some of these persons were sent to Syria by ISIS to engage in terrorism and now wish to infiltrate the United States in order to commit terrorist acts here. No evidence of this belief has been presented, however; it is nightmare speculation.

A portion of the Refugee Act codified at 8 U.S.C. § 1522 and entitled "Authorization for programs for domestic resettlement of and assistance to refugees" allows the federal government to give states money to assist refugees to become integrated into American society. The particular aims of the statute are to "(i) make available sufficient resources for employment training and placement in order to achieve economic self-sufficiency among refugees as quickly as possible, [and] (ii) provide refugees with the opportunity to acquire sufficient English language training to enable them to become effectively resettled as quickly as possible." 8 U.S.C. § 1522(a)(1)(A).

To receive the federal money a state must submit to the federal Office of Refugee Resettlement a plan for using the money to assist refugees to achieve economic self-sufficiency. 8 U.S.C. § 1522(a)(6). Indiana has submitted such a plan and it's been approved. Under the plan the state contracts with private resettlement agencies for the provision of social services to refugees, and the agencies are reimbursed by the state for the cost.

Another section of the Refugee Act provides that "services funded under this section shall be provided to refugees without regard to race, religion, nationality, sex, or political opinion." 8 U.S.C. § 1522(a)(5). But the governor of Indiana has refused to pay for providing these services to any refu-

gee whose "'country of origin' denominated on refugee documents" is Syria. (A refugee's country of origin is deemed his nationality unless he's stateless, in which event it's the nation in which he last resided. 8 U.S.C. § 1101(a)(42)(A).) Fearing that Syrian immigrants may be potential terrorists, the governor wants to minimize their number in Indiana. Acknowledging that he can't close Indiana's borders to them, he has shifted focus to the plaintiff in this case—Exodus, a private nonprofit resettlement agency in Indiana that seeks to help refugees, including Syrian refugees, adjust to life in Indiana. Exodus has a contract with the state that entitles the agency to be reimbursed for providing social services to resettled refugees, but the governor has forbidden Exodus or any other resettlement agency to be reimbursed for the costs of providing social services to *Syrian* refugees.

In fiscal year 2015 Exodus received roughly $1 million from the state for provision of social services and used the money to help 892 refugees, none of them Syrian. It expected to get a hundred or more Syrian refugees the next year, which would be this year, but we don't know how many it's gotten so far. We know that 174 Syrian refugees came to Indiana in the last fiscal year, but not how many of them are being helped by Exodus. But we do know for certain that Exodus will receive nothing from the state for Syrian refugees this year unless we affirm the preliminary injunction. Without the injunction, Exodus, if unable (as it fears) to obtain the necessary funds from another source, will be unable to provide essential assistance to the refugees. Most of them may therefore decide to resettle in other states—exactly what the governor of Indiana wants—in the face of the statutory provision we cited that forbids a state in distributing funds

received from the federal government under 8 U.S.C. § 1522(a)(5) to discriminate on the basis of "race, religion, *nationality*, sex, or political opinion" (emphasis added).

The governor's brief asserts "the State's compelling interest in protecting its residents from the well-documented threat of terrorists posing as refugees to gain entry into Western countries." But the brief provides no evidence that Syrian terrorists are posing as refugees or that Syrian refugees have ever committed acts of terrorism in the United States. Indeed, as far as can be determined from public sources, no Syrian refugees have been arrested or prosecuted for terrorist acts or attempts in the United States. And if Syrian refugees do pose a terrorist threat, implementation of the governor's policy would simply increase the risk of terrorism in whatever states Syrian refugees were shunted to. Federal law does not allow a governor to deport to other states immigrants he deems dangerous; rather he should communicate his fears to the Office of Refugee Resettlement.

He argues that his policy of excluding Syrian refugees is based not on nationality and thus is not discriminatory, but is based solely on the threat he thinks they pose to the safety of residents of Indiana. But that's the equivalent of his saying (not that he does say) that he wants to forbid black people to settle in Indiana not because they're black but because he's afraid of them, and since race is therefore not his motive he isn't discriminating. But that of course would be racial discrimination, just as his targeting Syrian refugees is discrimination on the basis of nationality.

A final oddity about the governor's position is how isolated it is. There are after all fifty states, and nothing to suggest that Indiana is a magnet for Syrians. Although in the fall

of 2015 a number of state governors issued statements opposing the resettlement of Syrian in their domains, their opposition petered out. Since then Syrian refugees have been resettled in 40 states (Indiana of course is one of them), and there is no indication that their absence from the other 10 is attributable to actions by state governments. Indiana is free to withdraw from the refugee assistance program, as other states have done; yet withdrawal might not interrupt the flow of Syrian refugees to the state because in states that choose not to participate in the refugee assistance program the federal government has been authorized to establish an alternative program, called Wilson/Fish, that distributes federal aid to refugees in a state without the involvement of the state government. 8 U.S.C. § 1522(e)(7); 45 C.F.R. § 400.69.

The district judge granted a preliminary injunction in favor of Exodus because she believed it likely to prevail in the trial on the merits that is the usual next stage of litigation after the issuance of such an injunction. She was right, and therefore the preliminary injunction is

AFFIRMED.