In the

# United States Court of Appeals
## For the Seventh Circuit

No. 16-1840

HEARTLAND ALLIANCE NATIONAL IMMIGRANT JUSTICE
CENTER,

*Plaintiff-Appellant,*

*v.*

U.S. DEPARTMENT OF HOMELAND SECURITY,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 9692 — **Charles R. Norgle**, *Judge.*

ARGUED SEPTEMBER 28, 2016 — DECIDED OCTOBER 21, 2016

Before POSNER, FLAUM, and MANION, *Circuit Judges.*

POSNER, *Circuit Judge*. Heartland Alliance's National Im-
migrant Justice Center (sometimes referred to as Heartland
Alliance National Immigration Justice Center—we'll just call
it the Center) is, we read on its website, www.immigrant
justice.org/about-nijc (visited October 19, 2016), "dedicated
to ensuring human rights protections and access to justice

for all immigrants, refugees and asylum seekers. [The Center] provides direct legal services to and advocates for these populations through policy reform, impact litigation, and public education. Since its founding three decades ago, [the Center] has been unique in blending individual client advocacy with broad-based systemic change." In the fall of 2011 the Center submitted to the Department of Homeland Security (and to other federal agencies as well, but we can ignore them) a request under the Freedom of Information Act, 5 U.S.C. § 552, for information relating to Tier III terrorist organizations, defined by the Immigration and Nationality Act in 8 U.S.C. § 1182(a)(3)(B)(vi)(III). The Department provided only some of the information requested by the Center, so the Center brought this suit to enjoin the Department from withholding the other information that the Center had sought—the names of what are referred to as "Tier III terrorist organizations." Membership in any of the tiers makes one inadmissible to the United States, with narrow exceptions.

Tier I and Tier II organizations are publicly identified terrorist groups such as ISIS and al-Qaeda. Tier III organizations are defined in 8 U.S.C. § 1182(a)(3)(B)(vi)(III) as any group of two or more people that engages in terrorist activity (as defined in 8 U.S.C. § 1182(a)(3)(B)(iv)), even if their terrorist activity is conducted exclusively against regimes that are enemies of the United States. Tier III organizations tend to have a lower profile than Tier I's or Tier II's, not only because the government does not publish their names but also because they tend to be groups about which the U.S. government does not have good intelligence, making it essential that the Department be able to obtain information about them during screening interviews that are as focused

and complete as possible. The district judge granted summary judgment for the Department on the ground that the names of the Tier III organizations are protected from disclosure under the Freedom of Information Act by the Act's 7(E) Exemption, 5 U.S.C. § 552(b)(7)(E). The judge then dismissed Heartland's suit with prejudice, precipitating this appeal.

The exemption embraces "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information … would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." The Center contends not without reason that names of organizations are not "guidelines." We are puzzled by the amount of space in its brief the government devotes to trying to show that they *are* "guidelines." Our puzzlement derives from our inability to see what difference it makes whether the names are or are not guidelines given that the heart of the exemption, at least so far as relates to this case, lies in its authorizing the government not to "disclose techniques and procedures for law enforcement investigations or prosecutions."

The government's unwillingness to turn over the names of Tier III organizations to the Center—which remember intends to publicize them if it gets its hands on them—rests on a combination of two concerns, both encompassed by the passage in the exemption that we just quoted. The first concern is implicit in the statutory definition of a Tier III organization—"a group of two or more individuals … which engages in" specified terrorist activities that involve acts of vio-

lence, 8 U.S.C. § 1182(a)(3)(B)(vi)(III), making it more likely than in the case of other asylum seekers that if admitted to the United States they would commit violent or otherwise unlawful acts. Second, as explained in the government's brief, "an alien who becomes aware that a particular organization has been found to fall within the definition of a Tier III organization will have a very strong incentive to falsify or misrepresent any and all encounters, activities, or associations that he or she may have had with that organization." If the alien doesn't know that a terrorist organization that he has belonged to, been affiliated with, or maybe simply has provided supplies or money to, has been identified by our government as a terrorist organization, he is likely to be less guarded in answering questions about his activities in or associations with the organization. But if he knows that the organization he belonged to or was associated with is deemed a terrorist organization, he is likely to deny having ever had *any* connection to it or even having ever *heard* of it. And if his denials are believed he may—even if he is a past and prospective future terrorist—not only escape the government's net but also cost the government an opportunity to obtain information about the organization that might in the future help in identifying terrorists. The withholding of the name of a terrorist organization from an alien who is being questioned is thus a technique of a law enforcement investigation that is squarely within the 7(E) exemption.

The Center argues that "no knowing terror affiliate will disclose his or her terror affiliation," and so the government will learn nothing less from its questioning of aliens if the names were publicized. Well obviously an alien seeking asylum in the United States is not going to tell the government, in response to the question whether he has ever belonged to

a terrorist organization, that he did, and it was called [whatever]. But that would be dumb interrogation. He'll be asked what he knows about terrorist activities in whatever region he's from, and in an effort to demonstrate cooperation he may offer information about some terrorist groups—and one of them may be one he has had dealings with. If the government is required to name all terrorist groups at the Tier III level this type of questioning will be ineffectual.

We learn in the Center's reply brief that its primary concern is not with names but with the Tier III category itself, for it says for example that "the designation of Tier III organizations is often doubtful." It hopes that if it can obtain the names of *all* the organizations—its goal in this litigation—it will be able to discredit some or perhaps many of them. Deeply distrustful of the U.S. government, by the tone and content of its briefs the Center signals its disbelief that the government has secrets worth keeping from asylum seekers and their helpers (such as the Center), but it does not explain what the government would gain by pretending that harmless organizations are actually terrorist groups. The government makes mistakes, but the Center has not shown that they're willful, or that Exemption 7(E), on which this litigation pivots, is either invalid—in fact the Center concedes that the exemption is valid—or inapplicable to the withheld names.

The judgment of the district court is

AFFIRMED.

MANION, *Circuit Judge*, concurring in the judgment. Under the Freedom of Information Act, Heartland Alliance's National Immigrant Justice Center seeks the release of documents relating to the denial of entry into the United States of certain individuals. In particular, it seeks the release of a list of the Tier III terrorist organizations that it claims is used to reject immigration applications. 8 U.S.C. § 1182(a)(3)(B)(vi)(III). For its part, the government claims that the release of some or all of these organizations' names is exempted from FOIA as law enforcement "guidelines," the release of which would facilitate the circumvention of our nation's immigration laws. This claim, if true, would allow the government to claim the protection of exemption 7(E), and refuse to release the list of these names. 5 U.S.C. § 552(b)(7)(E).

Because the government has demonstrated an adequate factual basis for its assertion that disclosure of these organizations could lead to circumvention of our nation's immigration laws, I concur in the judgment. *Enviro Tech Int'l*, 371 F.3d 370, 373 (7th Cir. 2004).

I write separately for two reasons. First, we need not go beyond affirming the decision of the district court. It properly granted summary judgment on the grounds that the list of Tier III names was a guideline within the meaning of 7(E). Disclosing the names risked allowing terrorists to circumvent the laws. But our court goes on to hold that the names are law enforcement "techniques" akin to the use of wiretapping in drug trafficking investigations, exempt from disclosure under 7(E) on that basis. That leaves us with no better guidance for what constitutes a "technique" or a "guideline" under 7(E).

At oral argument, the government noted plausible foreign relations grounds for the government withholding this information under other FOIA exemptions. Specifically, it noted that U.S. government relations with Tier III organizations might change on short notice, and that revealing certain Tier III organizations might have foreign policy ramifications. What one day might be an allied Christian militia fighting against the Islamic State (ISIS) might the next day be our nation's enemy, and while not rising to the level of a Tier I or II organization, might fall under Tier III. All of this suggests that the government has, in our nation's FOIA law, adequate alternative claims for exemption that it chose to avoid, so there is no need to broadly construe 7(E).

I write separately for a second, critical reason, which is my concern about the apparent lack of Syrian Christians as a part of immigrants from that country. It is possible that our case bears a direct link to this enigma.

It is well-documented that refugees to the United States are not representative of that war-torn area of the world. Perhaps 10 percent of the population of Syria is Christian, and yet less than one-half of one percent of Syrian refugees admitted to the United States this year are Christian.[1] Recognizing the crisis in Syria, the President in 2015 set a goal of resettling 10,000 refugees in the United States. And in August the government reached this laudable goal. And yet, of the nearly 11,000 refugees admitted by mid-September, only 56 were

---

[1] Stephen Dinian, *U.S. accepts record number of Syrian refugees in June despite terrorist screening worries*, WASH. TIMES, June 30, 2016, *available at* http://m.washingtontimes.com/news/2016/jun/30/us-accepts-record-number-of-syrian-refugees-in-jun/#!.

Christian. To date, there has not been a good explanation for this perplexing discrepancy.

This is not to suggest that any refugee group is more or less welcome: quite the contrary. The good people of this country routinely welcome immigrants from all over the world. But in a democracy, good data is critical to public debate about national immigration policy. When we demand high evidentiary burdens for states seeking to keep their citizens safe, and then prevent the states from obtaining that evidence, we create a Catch-22.[2]

At oral argument the government explicitly noted that allies of the United States today might become enemies tomorrow, and vice versa: groups might fall in and out of the Tier III designation. Because none of this is public, it is impossible to know if this is the major reason for the lack of Syrian Christian immigrants to the United States. It is at least possible that incidental affiliation with some Christian militia could lead an immigration officer to deny entry to Syrians on this basis. That would be a dubious consequence.

And yet, Congress, through the exemptions to FOIA, has consciously made the decision to limit what governmental information is available to the public. If Congress is concerned about how immigration officers are making their decisions related to the designation and application of the Tier III terrorist organization affiliation, Congress has the authority to act. Congress has its own oversight capabilities and subpoena

---

[2] *Exodus Refugee Immigration v. Pence*, No. 16-1509 (7th Cir. Oct. 3, 2016), *available at* http://media.ca7.uscourts.gov/cgi-bin/rssExec.pl?Submit=Display&Path=Y2016/D10-03/C:16-1509:J:Posner:aut:T:fnOp:N:1838881:S:0.

power, and Congress could choose to amend our nation's sunshine laws or our immigration laws. Until that time, however, many of us remain in the dark as a humanitarian catastrophe continues.