RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0186p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MARK CRAWFORD; RAND PAUL, in his official capacity as member of the United States Senate; ROGER JOHNSON; DANIEL KUETTEL; STEPHEN J. KISH; DONNA-LANE NELSON; L. MARC ZELL,

　　　　　　　*Plaintiffs-Appellants*,

　　　*v.*

UNITED STATES DEPARTMENT OF THE TREASURY; UNITED STATES INTERNAL REVENUE SERVICE; UNITED STATES FINANCIAL CRIMES ENFORCEMENT NETWORK,

　　　　　　　*Defendants-Appellees*.

No. 16-3539

---

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 3:15-cv-00250—Thomas M. Rose, District Judge.

Argued:  January 24, 2017

Decided and Filed:  August 18, 2017

Before:  BOGGS, SILER, and MOORE, Circuit Judges.

---

## COUNSEL

**ARGUED:**  James Bopp, Jr., THE BOPP LAW FIRM, PC, Terre Haute, Indiana, for Appellants. Richard Caldarone, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.  **ON BRIEF:**  James Bopp, Jr., Richard E. Coleson, Courtney Turner Milbank, THE BOPP LAW FIRM, PC, Terre Haute, Indiana, for Appellants.  Richard Caldarone, Gilbert S. Rothenberg, Teresa E. McLaughlin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

_____

**OPINION**

_____

BOGGS, Circuit Judge.  In 2010, Congress passed the Foreign Account Tax Compliance Act (FATCA), a law aimed at reducing tax evasion by United States taxpayers holding funds in foreign accounts.  FATCA imposes account-reporting requirements (and hefty penalties for noncompliance) on both individual taxpayers and foreign financial institutions (FFIs).  FFIs are further required to deduct and withhold a "tax" equal to 30% of every payment made by the FFI to a noncompliant (or "recalcitrant") account holder.  To implement FATCA worldwide, the United States Department of the Treasury (Treasury) and the Internal Revenue Service (IRS) have concluded intergovernmental agreements (IGAs), which facilitate FFIs' disclosure of financial-account information to the United States government, with more than seventy countries.  Separately from FATCA and the IGAs, the Bank Secrecy Act imposes a foreign bank account reporting (FBAR) requirement on Americans living abroad who have aggregate foreign-account balances over $10,000; willful failure to file an FBAR invites a penalty of 50% of the value of the reportable accounts or $100,000, whichever is *greater*.

Plaintiffs—who include Senator Rand Paul and several individuals who claim to be subject to FATCA and the FBAR—sought to enjoin the enforcement of FATCA, the IGAs, and the FBAR, and they now appeal the dismissal of their lawsuit for lack of standing.  For the reasons that follow, we affirm the judgment of the district court.

**I**

**A.  The Parties**

Plaintiffs' original verified complaint asserts claims against three defendants: Treasury, which administers FATCA and the FBAR; the IRS (an office of Treasury that also administers FATCA and the FBAR); and the United States Financial Crimes Enforcement Network (FinCEN), a Treasury Department bureau with administrative authority over the FBAR.  Each of the seven plaintiffs alleges a unique set of harms:

*Mark Crawford*

Plaintiff Mark Crawford is an American citizen living in Albania with a residence in Dayton, Ohio. Crawford owns Aksioner, a brokerage firm in Albania that is a partner of Saxo Bank in Copenhagen. Crawford alleges injury because Saxo will not allow Aksioner to accept clients who are United States citizens "in part because the bank does not wish to assume the burdens that would be foisted on it by FATCA." Crawford also claims that Aksioner—*which he owns*—denied Crawford's own application for a brokerage account, and that Crawford has suffered financial harm because FATCA is "forcing him to turn away prospective American clients living in Albania."

*Senator Rand Paul*

Senator Rand Paul claims that he "has been denied the opportunity to exercise his constitutional right as a member of the U.S. Senate to vote against the FATCA IGAs." Senator Paul claims that he would vote against the IGAs if they were submitted to the Senate for advice and consent under Article II, Section 2, of the United States Constitution, or if they were submitted to the whole Congress for approval as "congressional-executive agreements." Senator Paul does not otherwise challenge FATCA, and he does not in any way challenge the FBAR.

*Roger Johnson*

Plaintiff Roger Johnson is an American citizen living in Brno, Czech Republic. Johnson is married to Katerina Johnson, a Czech citizen with whom Johnson previously shared joint financial accounts before they separated their accounts to avoid subjecting Katerina's account information to disclosure under FATCA.

*Stephen J. Kish*

Plaintiff Stephen J. Kish is a Canadian citizen living in Toronto. Kish was also an American citizen at the time Plaintiffs' complaint was filed, but he has since renounced his American citizenship. Kish and his wife, a Canadian citizen, share a joint bank account at a Canadian bank. Kish alleges that "FATCA has at times caused some discord between" Kish and his wife because Kish's wife "strongly opposes the disclosure of her personal financial

information from [the] joint bank account to the U.S. government." Kish's wife, however, is neither a plaintiff nor a proposed plaintiff in this litigation.

### *Daniel Kuettel*

Plaintiff Daniel Kuettel is a Swiss citizen and former American citizen living in Bremgarten, Switzerland. Kuettel and his wife—a citizen of Switzerland and the Philippines—have a daughter (a citizen of the United States, the Philippines, and Switzerland) and a son (a citizen of the Philippines and Switzerland), both minors. Kuettel alleges that he renounced his citizenship in 2012 "because of difficulties caused by FATCA." For instance, Kuettel alleges that before renunciation, his efforts to refinance his mortgage with Swiss banks were unsuccessful but that he "was able to refinance his home with a Swiss bank shortly thereafter." Kuettel also alleges that he has a college-savings account for his daughter in his own name at a Swiss bank and wishes to transfer it to his daughter, but that he has refrained from doing so for fear that if he does, either he or his daughter or the account will be subject to the FBAR penalty "if the IRS determines that his daughter has 'wilfully' failed to file an FBAR." Kuettel alleges that his daughter is incapable of filing the FBAR or of renouncing her United States citizenship because "she is only ten years old and too young to shoulder such an obligation," and Kuettel does not wish to file the FBAR on his daughter's behalf as FinCEN would ordinarily require the parent of a minor child to do.

### *Donna-Lane Nelson*

Plaintiff Donna-Lane Nelson is a Swiss citizen and former American citizen living in both Geneva, Switzerland, and Argèles-sur-Mer, France. Nelson claims that she renounced her citizenship when, after FATCA was enacted, her Swiss bank (UBS) "notified her that she would not be able to open a new account if she ever closed her existing one[,] because she was an American." Nelson subsequently married an American citizen with whom she shares a joint bank account at BNP Paribas in France. Nelson alleges that she "has had her private financial account information disclosed to the IRS and the Treasury Department despite the fact that she is not a U.S. citizen," although Plaintiffs' pleadings provide no further insight as to the nature of this alleged disclosure, such as who made it, when it was made, or what it contained. Nelson has

also had to prove or explain to UBS, BNP Paribas, and Raiffeisen (another European bank) that she is not a United States citizen.

*L. Marc Zell*

Plaintiff L. Marc Zell is an American and Israeli citizen living in Israel. Zell, an attorney, alleges that "[b]ecause of FATCA, [he] and his firm have been required by their Israeli banking institutions to complete IRS withholding forms . . . as a precondition for opening trust accounts for both U.S. *and non-U.S.* persons and entities" (emphasis added). Zell alleges that the "Israeli banking officials have stated that they will require such submissions regardless of whether the beneficiary is a U.S. person . . . because the trustee is or may be a U.S. person," and that, as a result, "banks have required [him] and his firm to close the trust account in some cases, and in other instances the banks have refused to open the requested trust account." Zell alleges that he holds in trust certain client securities that are required by Israeli financial regulations to be "held by a qualified Israeli financial institution," but Zell's Israeli financial institution has requested Zell to transfer the securities elsewhere "because both he and the beneficiary in this instance are U.S. citizens." Finally, Zell alleges that his non-United States clients have been required by Israeli banks "to fill out the IRS forms even though they have no connection with the United States," and that "banking officials have stated that the mere fact a U.S. person trustee or his law firm is acting as a fiduciary is reason enough to require non-U.S. person beneficiaries to" report their identities and assets to the United States. Zell alleges that in "a few such instances," the client-beneficiary has terminated the attorney-client relationship, "resulting in palpable financial loss" to Zell and his firm.

*Proposed Additional Plaintiffs*

In addition to these seven plaintiffs, Plaintiffs' Proposed Amended Complaint sought to add three new plaintiffs: Plaintiff Johnson's wife Katerina Johnson, Plaintiff Kuettel's daughter Lois Kuettel, and Plaintiff Nelson's husband Richard Adams. The amended complaint also includes statements, absent from the original complaint, that some of Plaintiffs' bank balances exceeded the threshold amounts at which FATCA or FBAR requirements might apply, but the amended complaint otherwise recites the same claims and substantially the same facts as the

original complaint.  Importantly, none of the original plaintiffs or proposed plaintiffs alleges that they have faced direct consequences such as the imposition or threatened imposition of a financial penalty for noncompliance with FATCA, the IGAs, or the FBAR.

## B.  FATCA, the IGAs, and the FBAR

Plaintiffs assert challenges against five sets of laws: (1) FATCA's individual-reporting requirements; (2) FATCA's "FFI Penalty"; (3) FATCA's "Passthru Penalty"; (4) the IGAs; and (5) the FBAR Willfulness Penalty.

### 1.  FATCA's Individual-Reporting Requirements

FATCA requires United States taxpayers with "specified foreign financial assets" to file a special report with their annual tax returns that discloses the name and address of the financial institution that maintains each specified account; the name and address of any issuers of specified stocks or securities; information necessary to identify other specified instruments, contracts, or interests and their issuers; and the maximum value of each specified asset during the taxable year.  26 U.S.C. § 6038D(b)–(c).  The reporting requirement applies to any United States taxpayer when the "aggregate value of all [specified] assets exceeds $50,000 (*or such higher dollar amount as the secretary may prescribe*)."  § 6038D(a) (emphasis added).  Notably, the Secretary of the Treasury has prescribed higher dollar amounts for many taxpayers depending on their marital status, maximum asset value during the tax year, and place of residence.  The following individual-reporting thresholds have been in place since at least 2012:

|  | *Asset Value on Last Day of Tax Year* | *Asset Value at Any Time During Tax Year* |
|---|---|---|
| **If living in the United States** | | |
| Unmarried; married filing separately | $50,000 | $75,000 |
| Married filing jointly | $100,000 | $150,000 |
| **If living outside the United States** | | |
| Unmarried; married filing separately | $200,000 | $300,000 |
| Married filing jointly | $400,000 | $600,000 |

*See* 26 C.F.R. § 1.6038D-2(a); *see also* Treasury Insp. Gen. for Tax Admin., U.S. Dept. of Treasury, "The Internal Revenue Service Has Made Progress in Implementing the Foreign Account Tax Compliance Act," Fig. 1., Ref. No. 2015-30-085 (Sept. 23, 2015).

Plaintiffs' pleadings below and principal brief on appeal acknowledge only the $50,000 and $75,000 values applicable to single filers residing in the United States. *See, e.g.*, Appellants' Br. 2. Plaintiffs' reply brief obliquely acknowledges the $200,000/$300,000 threshold values that would seem to apply to most of the Plaintiffs on account of their overseas residences, noting that "the secretary has recently increased the triggering amount for individuals living abroad," but Plaintiffs argue that "the threshold could be lowered to the statutory minimum at any time, thus triggering reporting for Plaintiffs." Reply Br. 7.

Failure to report carries a penalty of up to $10,000 per violation plus 40% of the amount of any underpaid tax "attributable to" the assets for which disclosure was required. 26 U.S.C. §§ 6038D(d) ("[S]uch person *shall* pay a penalty of . . . .") (emphasis added), 6662(j)(3). No penalty is due, however, if failure to report is "due to reasonable cause and not due to willful neglect." *Id.* § 6038D(g).

Plaintiffs seek to enjoin the statutory reporting requirement, 26 U.S.C. § 6038D; the regulation that implements the reporting requirement, 26 C.F.R. § 1.6038D-4(a)(5); a regulation that requires disclosing the opening or closing of a specified foreign account, 26 C.F.R. § 1.6038D-4(a)(6); and a regulation that requires disclosing "income, gain, loss, deduction, or credit recognized . . . with respect to" specified assets, 26 C.F.R. § 1.6038D-4(a)(8).

## 2. *FATCA's Institutional-Reporting Requirements, the FFI Penalty, and the Passthru Penalty*

FATCA also imposes an *institutional*-reporting requirement on FFIs,[1] which an FFI can satisfy in one of three ways as set forth in 26 U.S.C. § 1471(b)(1), (b)(2), and (b)(3). First, the

---

[1]A "foreign financial institution" (FFI) is "any financial institution which is a foreign entity." 26 U.S.C. § 1471(d)(4). Financial institutions include any entity that "accepts deposits in the ordinary course of a banking or similar business," "holds financial assets for the account of others" "as a substantial portion of its business," or "is engaged (or holding itself out as being engaged) primarily in the business of investing, reinvesting, or trading in securities . . . , partnership interests, commodities . . . , or any interest" in the same. 26 U.S.C. § 1471(d)(5). FATCA thus reaches across the globe, although its extraterritorial reach is not directly at issue in this litigation, nor is it at issue at all in the present appeal, which concerns only the Plaintiffs' standing to sue.

FFI may enter into an agreement with Treasury whereby the FFI agrees, among other things, to take the following five actions:

(1) "to obtain such information regarding each holder of each account maintained by such institution as is necessary to determine which (if any) of such accounts are United States accounts";[2]

(2) to make annual reports to Treasury providing details on United States accounts, including the "name, address, and [Taxpayer Identification Number] of each account holder which is a specified United States person and, in the case of any account holder which is a United States owned foreign entity, the name, address, and [Taxpayer Identification Number] of each substantial United States owner of such entity"; the account number; the account balance or value; and "the gross receipts and gross withdrawals or payments from the account";

(3) "to deduct and withhold a tax equal to 30 percent of . . . any passthru payment[3] which is made by such institution to a recalcitrant account holder[4] or another foreign financial institution which does not meet the requirements of this subsection"—the so-called Passthru Penalty;

(4) to attempt to obtain a waiver from each account holder of any foreign law that would (but for such a waiver) prohibit the disclosure of the required information to the United States; and

(5) to close the accounts of any account holders from which such a waiver "is not obtained . . . within a reasonable period of time." 26 U.S.C. § 1471(b)(1).

---

[2]A "United States account" is "any financial account which is held by one or more specified United States persons or United States owned foreign entities," subject to certain exceptions not applicable here. 26 U.S.C. § 1471(d)(1)(A). United States persons include citizens and residents of the United States, domestic partnerships and corporations, estates other than foreign estates, and trusts subject to primary administrative supervision by a court of the United States where a United States person has authority to control "all substantial decisions" of the trust. 26 U.S.C. § 7701.

[3]A "passthru payment" is defined as "any withholdable payment or other payment to the extent attributable to a withholdable payment." 26 U.S.C. § 1471(d)(7). Withholdable payments include "(i) any payment of interest (including any original issue discount), dividends, rents, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, and other fixed or determinable annual or periodical gains, profits, and income, if such payment is from sources within the United States, and (ii) any gross proceeds from the sale or other disposition of any property of a type which can produce interest or dividends from sources within the United States." *Id.* § 1473(1)(A). The "withholding agent" with respect to each withholdable payment is obligated to deduct and withhold the 30% tax. Withholding agents include "all persons, in whatever capacity acting, having the control, receipt, custody, disposal, or payment of any withholdable payment." *Id.* § 1473(4).

[4]"Recalcitrant account holder" means any account holder that fails to comply with an FFI's "reasonable requests" for information necessary to determine which accounts are United States accounts; fails to provide name, address, Taxpayer Identification Number, and account-number information to an FFI for United States accounts; or fails, upon an FFI's request, to waive the applicability of a foreign law that would (but for a valid and effective waiver by the account holder) otherwise prohibit disclosure of such information. 26 U.S.C. § 1471(d)(6).

Second, the FFI "may be treated by the Secretary as meeting the requirements of" FATCA if the FFI either "complies with such procedures as the Secretary may prescribe to ensure that such institution does not maintain United States accounts" or "is a member of a class of institutions with respect to which the Secretary has determined that the application of [FATCA's reporting requirement] is not necessary." 26 U.S.C. § 1471(b)(2). As we discuss below, FFIs subject to the jurisdiction of countries that have signed IGAs with Treasury may be deemed compliant under 26 U.S.C. § 1471(b)(2) by virtue of their (and their country's) compliance with an IGA.

Third, the FFI may "elect" to withhold a tax from *payments sent to the FFI* from "accounts held by recalcitrant account holders or foreign financial institutions which do not meet the requirements of this subsection" rather than agreeing to withhold the 30% tax from *the FFI's payments* to recalcitrant account holders or noncompliant FFIs. 26 U.S.C. § 1471(b)(3).

If an FFI fails to meet FATCA's institutional-reporting requirement in one of these three ways, then the FFI is subject to having "a tax equal to 30 percent" deducted and withheld from *all* withholdable payments sent to the FFI. 26 U.S.C. § 1471(a). Plaintiffs assert and the government does not dispute that this tax—the so-called "FFI Penalty"—applies to United States-sourced income payable to the FFI as well as foreign-sourced income payable to the FFI from other FFIs. *See* 26 C.F.R. § 1.1471-2; Compl. 29; Appellees' Br. 4.

In short, if an FFI is not subject to the jurisdiction of a country that has concluded an IGA, the FFI must either comply with FATCA (and withhold the Passthru Penalty from payments it makes to recalcitrant account holders and noncompliant FFIs) or elect to have a 30% tax withheld from incoming payments from recalcitrant account holders or noncompliant FFIs; otherwise, the FFI becomes noncompliant itself and thus subject to the FFI Penalty of 30% of *all* withholdable payments[5] it receives from any source whatsoever.

Plaintiffs seek to enjoin the enforcement of the reporting requirement, the withholding provisions, the regulations implementing these provisions, and the IRS's use of Form 8966, "FATCA Report," on which FFIs make FATCA disclosures. Plaintiffs also seek to enjoin the

---

[5]*See* n.3, *supra*.

enforcement of the Passthru Penalty, which is the 30% "tax"[6] that FFIs deduct and withhold from payments to recalcitrant account holders or noncompliant FFIs under 26 U.S.C. § 1471(b)(1)(D). *See also* 26 C.F.R. §§ 1.1471-4(a)(1), 1.1471-4T(b)(1).

### *3. The IGAs*

Treasury, on behalf of the United States, has reached agreements with dozens of foreign governments to "facilitate the implementation of FATCA." 26 C.F.R. § 1.1471-1(b)(79). These intergovernmental agreements (IGAs) take two forms: "Model 1" IGAs and "Model 2" IGAs.

Under a Model 1 IGA, the foreign government agrees to collect the financial information that FATCA would otherwise require FFIs to report, and the foreign government itself reports that information directly to the IRS. Notably, the Model 1 IGA makes clear that as long as the foreign government "complies with its obligations under" the IGA, any FFI within that government's jurisdiction that also complies with its own obligations under the IGA (such as sending accountholder information to the foreign government) "shall be treated as complying with" FATCA[7] and is exempt from FATCA reporting, penalties, and withholding. *See, e.g.*, U.S. Dept. of Treasury FATCA Resource Center, Model 1A IGA Reciprocal, Preexisting TIEA or DTC, Art. 4, § 1, (Nov. 30, 2014), http://www.treasury.gov/resource-center/tax-policy/treaties/Documents/FATCA-Reciprocal-Model-1A-Agreement-Preexisting-TIEA-or-DTC-11-30-14.pdf.

Treasury has signed Model 1 IGAs with Canada (in force June 27, 2014), Czech Republic (in force December 18, 2014), Israel (in force August 29, 2016), France (in force October 14, 2014), and Denmark (in force September 30, 2015). Plaintiffs' original complaint, in which they sought to enjoin the Canadian, Czech, and Israeli IGAs, was filed July 14, 2015; Plantiffs sought leave to file their proposed amended complaint, which would also enjoin the French and the Danish IGAs, on October 30, 2015. Neither complaint mentions that although all the above-mentioned Model 1 IGAs were *signed* on June 30, 2014, the Israeli IGA was not yet *in force* at

---

[6]We decline to address whether the 30% deduction is a tax or a penalty.

[7]The IGAs are the principal means by which an FFI may be treated as complying with FATCA under 26 U.S.C. § 1471(b)(2), discussed above.

the time of filing either complaint. U.S. Dept. of Treasury FATCA Resource Center, https://www.irs.gov/pub/irs-drop/a-16-27.pdf. Indeed, the Israeli Knesset did not approve regulations implementing FATCA until August 4, 2016. Nevertheless, Treasury has declared that any foreign jurisdiction that signed an IGA before November 30, 2014, would be treated "as if [it had] an IGA in effect" and would thus be exempt from FATCA reporting, penalties, and withholding—including penalties against recalcitrant account holders—"as long as the jurisdiction is taking the steps necessary to bring the IGA into force within a reasonable period of time." *See* IRS Announcement 2016-27, https://www.irs.gov/pub/irs-drop/a-16-27.pdf; IRS Announcement 2013-43, https://www.irs.gov/pub/irs-drop/n-13-43.pdf. One such announcement set December 31, 2016, as the date by which jurisdictions whose IGAs were not yet in force owed "a detailed explanation" to Treasury. *See* IRS Announcement 2016-27 at 2–3. The result of the Treasury notices and the pending IGA is that from the time Plaintiffs' complaint was filed until well after the district-court record closed, neither FATCA nor any IGA had any legal effect in Israel.

Under a Model 2 IGA, the foreign government agrees to modify its laws to the extent necessary to enable its FFIs to report their United States account information directly to the IRS. Treasury has signed a Model 2 IGA with Switzerland (in force June 2, 2014), in which the Swiss government has agreed to "direct all Reporting Swiss Financial Institutions" to "register with the IRS" and comply with applicable FATCA provisions. Swiss IGA Art. 3 § 1. One provision of the Swiss IGA, Article 5, is not yet in force because it requires that a separate "Protocol"—an amendment to a bilateral tax treaty that was signed by the United States and Switzerland in 2009—first come into force, but the United States Senate has not yet approved that Protocol, leaving Article 5 inoperative. Article 5 would authorize the United States to make "group requests" to the Swiss Federal Department of Finance or its designee for aggregated reportable-account information. Swiss IGA Art. 2 § 1; Art. 5. Despite the fact that Article 5 is inoperative, however, the Swiss Model 2 IGA, somewhat like the Model 1 IGAs, provides that Swiss FFIs that register with the IRS and comply with an "FFI Agreement" (essentially, an agreement between an individual Swiss FFI and the United States government to report United States account information) "shall be treated as complying with" FATCA and are thus exempt from any provisions of FATCA beyond those incorporated into the IGA or FFI Agreement. Swiss IGA

Art. 6. Swiss FFIs' obligations are lighter under the IGA than under FATCA: for example, as long as a Swiss FFI complies with the registration and reporting requirements in Article 3 of the IGA, it is not required to withhold the passthru tax from recalcitrant account holders or to close any account holders' accounts. Swiss IGA Art. 7 § 1.

Plaintiffs seek to invalidate the Canadian, Czech, Israeli, French, Danish, and Swiss IGAs.

### 4. *The FBAR Willfulness Penalty*

The last set of laws at issue is the foreign-bank-account-reporting (FBAR) requirement of the Bank Secrecy Act, which requires any United States person with "a financial interest in or signature authority over at least one financial account located outside of the United States" to file FinCEN Form 114 (also referred to as the FBAR) with Treasury annually. Reporting is required for accounts held during the previous calendar year if "the aggregate value of all foreign financial accounts exceeded $10,000 at any time during the calendar year reported." *See* 31 U.S.C. § 5314; 31 C.F.R. §§ 1010.306(c), .350. The FBAR appears to have nothing to do with FATCA or the IGAs other than that presumably most if not all individuals subject to FATCA's reporting requirement are also required to file an FBAR, since the reporting threshold for the FBAR is lower than any reporting threshold for FATCA.

Nevertheless, Plaintiffs challenge the FBAR's willful-failure-to-report penalty ("Willfulness Penalty"), which provides that "[t]he Secretary of the Treasury *may* impose" a penalty equal to the *greater* of $100,000 or half the value in the reportable account(s) at the time of the violation. 31 U.S.C. § 5321(a)(5)(A), (C) (emphasis added). The ordinary penalty (absent a showing of willfulness), which Plaintiffs do not challenge, is $10,000 per violation. *Id.* § 5321(a)(5)(B)(i). Plaintiffs also seek to enjoin the FBAR account-balance-reporting requirement—that is, the requirement to complete FinCEN Form 114.

### C. Counts Enumerated in the Complaint

In both the original complaint and the proposed amended complaint, Plaintiffs brought eight counts against Defendants. A brief summary of the counts is provided here as relevant

background, although Plaintiffs need not demonstrate that they are likely to *prevail* as to any of these counts in order to have *standing* to bring them.

### Counts 1 & 2: The IGAs Were Unconstitutionally Executed

Plaintiffs claim in Count 1 that the IGAs are "unconstitutional sole executive agreements" that exceed the scope of the President's constitutional power because they are not authorized by Congress through the ordinary legislative process. Compl. 37. Plaintiffs claim that the only constitutionally permissible means by which the executive branch may make international agreements are by the Treaty Clause, an Act of Congress, a provision in an existing treaty, or the President's independent constitutional foreign-affairs power—which Plaintiffs claim does not include the power to impose a tax or to create a tax-collection mechanism like the IGAs.

Alternatively, in Count 2, Plaintiffs claim that the IGAs are impermissible because they are "inconsistent with legislation enacted by Congress in the exercise of its constitutional authority"—namely, FATCA—to the extent that they, among other things, allow FFIs to report to their national governments rather than to the IRS. Amended Compl. 49 (quoting State Department Foreign Affairs Manual). Plaintiffs thus claim that the IGAs "override" FATCA and "must be held unlawful and set aside" because "Treasury and the IRS have acted contrary to the President's constitutional power" in entering into the IGAs.

### Count 3: The FATCA, IGA, and FBAR Reporting Requirements
### Violate the Equal Protection Clause

Plaintiffs claim that compared to the various data reported to the IRS about foreign accounts under FATCA, the IGAs, and the FBAR, "[t]he only financial information reported to the IRS about domestic accounts is the amount of interest paid to the accounts during a calendar year." Plaintiffs thus claim that United States citizens living abroad are treated differently than United States citizens living in the United States, in violation of the Fourteenth Amendment Equal Protection Clause (as incorporated against the federal government through the Fifth Amendment Due Process Clause). *See United States v. Ovalle*, 136 F.3d 1092, 1095 n.2 (6th Cir. 1998).

*Counts 4–6: The FFI Penalty, Passthru Penalty, and FBAR Willfulness
Penalty Impose Unconstitutionally Excessive Fines*

In Count 4, Plaintiffs challenge the FFI Penalty, which is imposed directly upon FFIs for noncompliance with FATCA, as an unconstitutionally excessive fine, claiming that "[t]he penalty is used as a hammer to coerce compliance by [FFIs] everywhere in the world." Plaintiffs claim that the penalty is unconstitutional because it "is grossly disproportional to the gravity of the offense it seeks to punish." In Count 5, Plaintiffs lodge the same attack against the Passthru Penalty, which FFIs apply to recalcitrant account holders under FATCA. In Count 6, Plaintiffs lodge the same attack against the FBAR Willfulness Penalty.

*Counts 7 & 8: The Institutional-Reporting Requirements of FATCA and the IGAs
Violate Plaintiffs' Fourth Amendment Right to Privacy*

In Count 7, Plaintiffs claim that FATCA's requirement that FFIs report account data to the United States constitutes a warrantless search in violation of Plaintiffs' Fourth Amendment protection against unreasonable searches and seizures. In Count 8, Plaintiffs claim that the IGAs' requirement that FFIs report account data either to their governments or to the United States likewise violates the Fourth Amendment.

**D. Procedural History**

Plaintiffs filed their original complaint in the United States District Court for the Southern District of Ohio on July 14, 2015. Plaintiffs moved for a preliminary injunction, which the district court denied, holding that Plaintiffs were not likely to succeed on the merits because they lacked standing and, alternatively, because they had brought allegations that failed as a matter of law. On October 30, 2015, Plaintiffs moved for leave to amend their complaint. The government filed both a motion to dismiss and an opposition to Plaintiffs' motion for leave to amend.

On April 26, 2016, the district court granted the government's motion to dismiss for lack of standing, declined to reach the government's motion to dismiss for failure to state a claim, and denied Plaintiffs' motion for leave to amend. The district court denied leave to amend only after considering the new plaintiffs and their new claims and after determining that even if leave to

amend were granted, Plaintiffs still would not have standing to sue, rendering leave to amend futile.  This timely appeal followed.

In the interest of simplicity, we will discuss whether Plaintiffs have standing in light of the facts pleaded in both the original complaint and the proposed amended complaint.  For the reasons that follow, the district court rightly held that none of the plaintiffs had standing to sue, and that granting leave to amend would not cure the defect in standing.

## II

### A.  Elements of Standing

Federal courts have constitutional authority to decide only "cases" and "controversies." U.S. Const. art. III § 2; *see Muskrat v. United States*, 219 U.S. 346 (1911).  The requirement of standing is "rooted in the traditional understanding of a case or controversy."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  To bring suit, Plaintiffs must have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues" before the court.  *Baker v. Carr*, 369 U.S. 186, 204 (1962).

The "irreducible constitutional minimum" of standing is that for each claim, each plaintiff must allege an actual or imminent injury that is traceable to the defendant and redressable by the court.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–62 (1992) (holding wildlife-conservation organizations lacked standing to seek injunctive relief against the Secretary of the Interior's interpretation of the Endangered Species Act where organization members' harm was the endangering of wild animals in Sri Lanka but where the members had no current plans to go to Sri Lanka to observe the animals); *see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 185 (2000) (agreeing that "a plaintiff must demonstrate standing separately for each form of relief sought").

### 1. Injury

The injury must be an "injury in fact," meaning "an invasion of a *legally protected interest* which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical."'"  *Lujan*, 504 U.S. at 560 (emphasis added) (citations omitted) (first quoting

*Allen v. Wright*, 468 U.S. 737, 751 (1984); then quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983))).

There is no "legally protected interest" in maintaining the privacy of one's bank records from government access. *United States v. Miller*, 425 U.S. 435, 442 (1976) (holding bank clients had no legitimate expectation of privacy in banking information revealed to a third party); *United States v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010) (noting that *Miller* involved "business records" as opposed to "confidential communications").

The requirement that an injury be "concrete and particularized" has two discrete parts: concreteness, which is the requirement that the injury be "real," and not "abstract," *Spokeo*, 136 S. Ct. at 1548, and particularization, which is the requirement that the plaintiff "*personally* [have] suffered some actual or threatened injury" as opposed to bringing a generalized grievance. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982) (emphasis added).

**Concreteness.** "Abstract, intellectual problems," *FEC v. Akins*, 524 U.S. 11, 20 (1998), "abstract concern," *Diamond v. Charles*, 476 U.S. 54, 67 (1986), and "[a]bstract injury," *Lyons*, 461 U.S. at 101, do not present concrete injuries. That said, concrete is not synonymous with tangible: intangible harms such as those produced by defamation or the denial of individual rights may certainly be concrete enough to constitute an injury in fact. *Spokeo*, 136 S. Ct. at 1549.

**Particularization.** Additionally, "a plaintiff raising only a generally available grievance about government—claiming only harm to his *and every* citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573–74 (emphasis added); *see also Massachusetts v. Mellon*, 262 U.S. 447, 487 (1923) (denying municipal taxpayer standing to challenge federal spending measure because the taxpayer's "interest in the moneys of the Treasury—partly realized from taxation and partly from other sources—is shared with millions of others; is comparatively minute and indeterminable");

*Hollingsworth v. Perry*, 133 S. Ct. 2652, 2662 (2013) ("[A]n asserted right to have the Government act in accordance with law is not sufficient, standing alone[.]").

**Legislative standing.** The general rule that individual legislators lack standing to sue in their official capacity as congressman or senator follows from the requirement that an injury must be concrete and particularized. *See Raines v. Byrd*, 521 U.S. 811, 816, 821 (1997) (in action by members of Congress to challenge the Line Item Veto Act, "loss of political power"— as opposed to loss of a private right—was not a concrete injury, and any institutional injury to Congress arising from the Act was not particularized to any individual plaintiff). An apparent exception to the general rule against legislative standing arises when the legislators are suing on a vote-nullification theory and allege that if their votes had been given effect, those votes would have been sufficient to defeat or enact a specific legislative action. *Coleman v. Miller*, 307 U.S. 433, 438 (1939) (holding that where forty-member Kansas State Senate had deadlocked twenty-to-twenty in voting on a proposed constitutional amendment, the twenty senators who had voted against the amendment had standing to challenge the constitutionality of the lieutenant governor's tie-breaking vote in favor of the amendment, because the lieutenant governor's vote effectively nullified the plaintiffs' votes *and* the plaintiffs' votes would have been sufficient to prevent ratification of the amendment); *see also Baird v. Norton*, 266 F.3d 408, 410 (6th Cir. 2001) (holding that a Michigan House member and a Michigan state senator lacked standing to challenge gaming compacts that were approved by a concurrent-resolution procedure requiring only a majority of votes cast rather than by the ordinary legislative process that would have required a majority of the votes of all members in each house).

We held in *Baird* that to the extent that the legislators complained of the deprivation of procedural safeguards built into the ordinary legislative process, they had "at most, a generalized grievance shared by all Michigan residents alike," and thus lacked the sort of particularized injury in fact that standing requires. *Baird*, 266 F.3d at 411. And we held that the legislators could not show a *Coleman*-like vote-nullification injury because their votes "would not have been sufficient to defeat either the concurrent resolution . . . or legislation to similar effect." *Id.* at 412. In such circumstances, legislators' remedy lies not with the courts but with the legislative

process, for, as the Supreme Court noted in *Raines*, the legislature could simply "vote to repeal" offending legislation. 521 U.S. at 824.

**Actual or imminent.** Standing can derive from an imminent, rather than an actual, injury, but only when "the threatened injury is real, immediate, and direct." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (holding candidate for House of Representatives had standing to challenge election regulation exempting opponents of self-financing candidates from certain campaign-contribution limits where plaintiff candidate had declared his candidacy and was demonstrably a self-financing candidate whose opponents would imminently receive expanded access to campaign funding).

In a pre-enforcement challenge to a federal statute, the Supreme Court has held that a plaintiff satisfies the injury requirement of standing by alleging "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)); *see also Warth v. Seldin*, 422 U.S. 490 (1975); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977) (holding that one of the plaintiffs had standing to challenge a discriminatory zoning law where an injunction against the law would have produced "at least a 'substantial probability,' *Warth*, 422 U.S. at 504, that" the plaintiff's desired housing project would "materialize").

The mere *possibility* of prosecution, however—no matter how strong the plaintiff's intent to engage in forbidden conduct may be—does not amount to a "credible threat" of prosecution. Instead, the threat of prosecution "must be *certainly impending* to constitute injury in fact." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (quoting *Whitmore*, 495 U.S. at 158). Putting the Supreme Court's language in *Warth*, *Driehaus*, and *Clapper* together: to have standing to bring a pre-enforcement challenge to a federal statute, there must be a *substantial probability* that the plaintiff actually will engage in conduct that is *arguably affected* with a constitutional interest, and there must be a *certain* threat of prosecution if the plaintiff does indeed engage in that conduct.

Further, lawsuits that do not challenge "specifically identifiable Government violations of law," but instead challenge "particular programs agencies establish to carry out their legal obligations are . . . rarely if ever appropriate for federal-court adjudication." *Lujan*, 504 U.S. at 568 (citation omitted).

Past injury is also inadequate to constitute an injury in fact when the plaintiff seeks injunctive relief but not does suffer "any continuing, present adverse effects." *Lyons*, 461 U.S. at 102 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)).

**Third-party standing.** Generally, "a plaintiff must 'assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Coyne ex rel. Ohio v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999) (quoting *Warth*, 422 U.S. at 499); *see also Ovalle*, 136 F.3d at 1100–01; *Powers v. Ohio*, 499 U.S. 400, 410 (1991)). The rare "third-party standing" exception to this requirement allows federal courts to hear cases in which a plaintiff can "show that (1) it has suffered an injury in fact; (2) it has a close relationship to the third party; and (3) there is some hindrance to the third party's ability to protect his or her own interests." *Mount Elliott Cemetery Ass'n v. City of Troy*, 171 F.3d 398, 404 (6th Cir. 1999); *see also Connection Distrib. Co. v. Reno*, 154 F.3d 281, 295 (6th Cir. 1998). Plaintiffs have expressly stated that they "rely neither on third-party standing nor [on] the harms of others," Appellants' Br. 24, but the Government contends that without invoking third-party standing, Plaintiffs would have no way to attack the FFI Penalty, which is imposed only on financial institutions that are not parties to this litigation.

## 2. Causation

Even if a plaintiff alleges an actual or imminent injury that is concrete and particularized, the plaintiff must also show that the injury is "fairly traceable to the defendant's allegedly unlawful conduct." *Allen*, 468 U.S. at 751 (holding parents of schoolchildren lacked standing to sue IRS to challenge private schools' tax exemptions where the parents' alleged harm of increased school segregation was caused by the private schools' choice to racially discriminate and was not fairly traceable to the IRS). When a plaintiff's alleged injury is the result of "the independent action of some third party not before the court," the plaintiff generally lacks

standing to seek its redress. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42 (1976); *see also Lujan*, 504 U.S. at 560–61; *Shearson v. Holder*, 725 F.3d 588, 592 (6th Cir. 2013); *Ammex, Inc. v. United States*, 367 F.3d 530, 533 (6th Cir. 2004) (holding that a retailer lacked standing to challenge a federal excise tax assessed against a third-party fuel supplier, even where the retailer was required by contract to pay the supplier an amount equal to the excise tax upfront at the time of purchase, since the "alleged injury . . . in the form of increased fuel costs was not occasioned by the Government").

Neither is injury caused by market conditions fairly traceable to a regulation that happens to regulate that market. *Warth*, 422 U.S. at 506 (holding Rochester-area residents lacked standing to challenge suburb's zoning as unconstitutionally excluding low- and moderate-income residents where plaintiffs were unable to allege other than in conclusory terms that they had been injured; where none of the plaintiffs personally owned property in the suburb or had been denied a variance or permit by the suburb; and where the plaintiffs' "inability to reside in [the suburb was] the consequence of the economics of the area housing market, rather than respondents' assertedly illegal acts").

Nor is an injury fairly traceable to the defendant's conduct if the plaintiffs have "inflict[ed] [the] harm on themselves based on their fears of hypothetical future harm." *Clapper*, 133 S. Ct. at 1151.

As we noted above, Plaintiffs do not rely on third-party standing. Rather, Plaintiffs argue that they have suffered "indirect" harm. An indirect harm is an injury caused to a plaintiff when the defendant's unlawful conduct harms a third party who in turn causes the plaintiff's harm— unlike in third-party standing cases, a plaintiff claiming indirect harm is seeking to vindicate the plaintiff's *own* rights and not a third party's. Appellants' Br. 23 (citing *Roe v. Wade*, 410 U.S. 113, 124 (1973)). Plaintiffs rely heavily on *Roe*: they argue that the law challenged in *Roe directly* harmed abortionists, not women seeking abortions, but that the *indirect harm* to women seeking abortions was nevertheless fairly traceable to the law. Plaintiffs argue that in *Roe*, the doctors had only two options (provide abortions and thus break the law, or comply with the law by declining to provide abortions); Plaintiffs argue that in this case, similarly, FFIs have only

two options: disregard FATCA and thus become subject to the 30% FFI Penalty, or comply with FATCA by refusing to do business with certain United States persons.

But Plaintiffs' analogy overlooks a third option available here and not in *Roe*: FFIs may comply with FATCA *and* do business with United States persons—*without* imposing additional requirements on their clients beyond what FATCA and the IGAs themselves require.[8]  As we will discuss, several of Plaintiffs' alleged harms arise not from FFIs' acting under the *command* of FATCA or an IGA, but rather from the FFIs' voluntary choice to go *above and beyond* FATCA and the IGAs.  FFIs may do so, for example, by gathering FATCA-compliance-related information from non-United States persons, or by choosing not to do business with certain individuals, whether to protect their own interests in FATCA compliance or for some other reason.  *See, e.g.*, Amended Compl. 12 ("[R]ather than reporting information about U.S. clients, Saxo Bank is turning away U.S. citizens like Mark.").  And although an injury "produced by" a defendant's "determinative or coercive effect" upon a third party (such as the injury of inability to obtain an abortion, produced by the determinative effect of the challenged law in *Roe* upon abortionists) may suffice for standing, an injury that results from the third party's *voluntary and independent* actions or omissions does not.  *Bennett v. Spear*, 520 U.S. 154, 169 (1997).

### 3. Redressability

Finally, a plaintiff must also plead facts sufficient to establish that the court is capable of providing relief that would redress the alleged injury.  *Lujan*, 504 U.S. at 561–62.

---

[8]Plaintiffs' *Roe* analogy also fails when individual account holders are compared to the plaintiffs in *Roe*: the account holders' options are not "close your account or pay the penalty," but rather "close your account, pay the penalty, or keep your account open while filing the required paperwork to do so."  This is unlike *Roe* where a woman seeking an abortion that was not otherwise permitted had no "third option": the only options were to seek an illicit abortion or to decline to have the abortion in the first place.  A similar analogy could be drawn to highway-speed laws: a motorist wishing to travel quickly, perhaps to transport perishable goods or to visit an ill relative, has only the option to speed (and risk a traffic citation) or to comply with the law (and risk having spoiled goods or missing the death of a relative).  In such a situation, the motorist might well be able to argue that the injury of having spoiled goods or missing the death of the relative was fairly traceable to the speed-limit law.  But this situation would *not* be like the Plaintiffs' situation here—rather, it would be analogous to the Plaintiffs' situation here if the motorist had a third option of speeding upon condition of filing paperwork with the state attesting to the reasons why speeding is necessary.  Perhaps if that paperwork itself were difficult to file, an injury could arise from the time and trouble spent filing it—but, notably, Plaintiffs stated at oral argument that they do not assert that the time and trouble of filing FATCA paperwork is itself an injury for standing purposes.

**B. Burden of Proof and Standard of Review**

Each plaintiff has the burden "clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *Warth*, 422 U.S. at 518. "[W]e assess standing as of the time a suit is filed." *Clapper*, 133 S. Ct. at 1157. And standing must remain "extant at all stages of review." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)).

"Standing cannot be 'inferred argumentatively from averments in the pleadings,'" *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quoting *Grace v. American Central Ins. Co.*, 109 U.S. 278, 284 (1883)), or even from the government's concession of standing, "but rather 'must affirmatively appear in the record.'" *FW/PBS*, 493 U.S. at 231–36 (quoting *Mansfield C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 392 (1884)) (holding certain plaintiffs did not have standing to attack ordinance governing sexually oriented businesses where the record did not reveal that any one of these plaintiffs was subject to the ordinance, even though the city attorney conceded at oral argument before the Supreme Court that "one or two" of them had had their licenses denied under the ordinance). The Supreme Court has "always insisted on strict compliance with this jurisdictional standing requirement," *Raines*, 521 U.S. at 819. And the inquiry into whether plaintiffs have standing is "especially rigorous" where, as here, "reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Clapper*, 133 S. Ct. at 1147 (quoting *Raines*, 521 U.S. at 819–20).

We review de novo the district court's dismissal for lack of standing, we accept as true all the material allegations in the Plaintiffs' complaints, and we construe Plaintiffs' complaints in Plaintiffs' favor. *See Jenkins v. McKeithen*, 395 U.S. 411, 421–22 (1969); *Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 423 (6th Cir. 2016).

## C.  No Plaintiff Has Standing as to Any Claim

### 1.  *No Plaintiff Has Standing to Challenge FATCA*

No Plaintiff has standing to challenge FATCA's individual-reporting requirements or the Passthru Penalty because no Plaintiff (or proposed Plaintiff) has alleged either an *actual* injury that is fairly traceable to FATCA or an *imminent* threat of prosecution from noncompliance with FATCA.

First, no Plaintiff has alleged any actual enforcement of FATCA such as a demand for compliance with the individual-reporting requirement, the imposition of a penalty for noncompliance, or an FFI's deduction of the Passthru Penalty from a payment to or from a foreign account.

Second, no Plaintiff can satisfy the *Driehaus* test for standing to bring a pre-enforcement challenge to FATCA because no Plaintiff claims to hold enough foreign assets to be subject to the individual-reporting requirement, and, as a result, no Plaintiff can claim that there is a "credible threat" of either prosecution for failing to comply with FATCA or imposition of a Passthru Penalty by an FFI.  All but two of the Plaintiffs either fail to state the value of their foreign assets altogether or allege only that they have foreign accounts with an aggregate value "greater than $10,000"—but FATCA's individual-reporting requirement applies only to individuals with *at least* $50,000 worth of assets held in foreign accounts, with significantly higher thresholds in some cases.  *See, e.g.*, Amended Compl. 12, 19, 21, 28, 30, 34.

The two exceptions are Johnson and Zell.  Johnson has alleged that "[t]he aggregate value of [his] foreign accounts has been greater than $75,000 in 2014 and 2015[,] which subjects him to both FATCA individual reporting and FBAR reporting." *Id.* at 16.  But Johnson lives outside the United States and would thus have to hold foreign accounts with an aggregate value in excess of *$200,000* to be subject to the individual-reporting requirement.  That Treasury might someday lower the threshold from $200,000 to $50,000 (the *statutory* minimum) or $75,000 or any other level does not change the fact that, now and at the time Plaintiffs filed suit, Johnson is not subject to FATCA.  Nor is it of any consequence that Johnson's *foreign banks* may be subject to FATCA's *institutional*-reporting requirement on account of Johnson's ownership of

accounts exceeding $75,000 in value. Johnson cannot challenge the individual-reporting requirement or the Passthru Penalty without showing that Johnson *himself* is subject to those provisions, and based on the facts as stated in Plaintiffs' pleadings, Johnson is not.

Further, Johnson—like all Plaintiffs—lacks standing to challenge FATCA's FFI Penalty (the penalty imposed upon financial institutions for *their* noncompliance with FATCA) because such a challenge would require either that the foreign banks themselves bring suit or that Plaintiffs rely on third-party standing, and Plaintiffs have made clear that they do not.

As for Zell, he alleges that he "had *signatory authority* over accounts with an aggregate year-end balance of greater than $200,000 in 2014, which would subject him to FATCA individual reporting." *Id.* at 34 (emphasis added). But, although the Israeli IGA imposes a reporting requirement for trust accounts like Zell's, FATCA *itself* does not require reporting where, as here, the trust accounts are held entirely for the benefit of non-United States persons. And although the Israeli IGA appears as of August 2016 to be in force in Israel, it was not in force prior to then. Zell could not have been subject to FATCA's individual-reporting requirement, either at the time Plaintiffs' complaint was filed or at the time Plaintiffs sought leave to amend their complaint, based either on Zell's own accounts (for which he alleges only an aggregate value exceeding $10,000) or on Zell's "signatory authority" over his clients' trust accounts, because only the Israeli IGA, not FATCA itself, required (or requires) reporting of accounts based on signatory authority, and the Israeli IGA was not in effect when Plaintiffs filed or sought to amend their complaint.

Finally, some Plaintiffs allege other harms arising from FATCA apart from its individual-reporting requirement or its Passthru Penalty. But none of these alleged harms are injuries that are fairly traceable to FATCA. Crawford alleges that Saxo Bank's decision not to allow Crawford (or Aksioner, Crawford's brokerage firm) to accept United States clients, is an injury; even if it is, however, it is not fairly traceable to FATCA but rather, as in *Allen* and *Ammex*, to Saxo Bank's own independent actions. The Johnsons' decision to separate their own assets to avoid disclosing Katerina Johnson's financial affairs to the United States government when there is no allegation that FATCA has actually compelled any such disclosure, similarly, is traceable to the Johnsons' own independent actions, not to FATCA.

Nelson alleges that she has "had her private financial account information disclosed to the IRS and the Treasury Department despite the fact that she is not a U.S. citizen." Amended Compl. 28. But Nelson has stated no facts whatsoever indicating that her account information was disclosed *because of FATCA*—and thus any injury resulting from this disclosure cannot fairly be traced to FATCA.

In Plaintiffs' complaint, Adams and Zell have alleged that they have had difficulty obtaining banking services from foreign banks. Zell specifically alleges that he has been told to move securities out of an Israeli bank and that he has been informed that his non-United States clients are required to complete IRS forms at the request of Israeli banks. But, again, a foreign bank's choice either not to do business with Adams or Zell, or (as in Zell's case) to require Zell's non-United States clients to make financial or other disclosures even though these clients are not subject to FATCA, is a choice voluntarily made by the bank and is not fairly traceable to FATCA. And the resulting choice of any of Zell's clients not to do business with Zell is fairly traceable to the clients or perhaps to the Israeli banks, but is not fairly traceable to FATCA. Likewise with Kuettel, who alleges that he had difficulty refinancing his mortgage until after he renounced his American citizenship: such difficulty cannot serve as the basis for standing because it is, at best, past injury that is insufficient to warrant injunctive relief (it is past injury because Kuettel *has* renounced his American citizenship and no longer claims to have difficulty refinancing his mortgage), and, in any event, it is traceable only to the foreign banks and not to FATCA because nothing in FATCA prevented the foreign banks from refinancing Kuettel's mortgage.

Several plaintiffs allege injuries that are not concrete. Kish, for example, alleges that "FATCA has at times caused some discord between" him and his wife. *Id.* at 19. But marital discord, particularized though it may be, is not the sort of concrete injury that can give rise to standing. Neither is Crawford or Johnson's discomfort with FATCA's reporting requirements, or Nelson's "resent[ment]," *id.* at 28, at having to prove to European banks that she is no longer a United States citizen in order to obtain banking services.

In sum, no Plaintiff has standing to challenge FATCA's individual-reporting requirements, the Passthru Penalty, or the FFI Penalty, because no Plaintiff has suffered direct

harm that is fairly traceable to any of these challenged provisions, and because no Plaintiff has alleged sufficient facts to show a credible threat of prosecution for noncompliance with any of these challenged provisions. At best, Plaintiffs' claimed injuries are the second-order effects of government regulation on the market for international banking services. But "consequence[s] of the economics" of holding foreign assets are not, on their own, injuries in fact for the purpose of demonstrating Article III standing. *Warth*, 422 U.S. at 506. Because the burden of establishing standing falls squarely on the plaintiff, and because we are constrained to examine the district-court pleadings alone to determine whether standing existed at the time the complaint was filed, we hold that no Plaintiff has standing to challenge FATCA.

### 2. *No Plaintiff Has Standing to Challenge the IGAs*

Senator Paul challenges the constitutionality of the IGAs. Senator Paul alleges harm because he "has been denied the opportunity to exercise his constitutional right as a member of the U.S. Senate to vote against the FATCA IGAs." *Id.* at 13. But, as in *Raines*, any incursion upon Senator Paul's political power is not a concrete injury like the loss of a private right, and any diminution in the *Senate*'s lawmaking power is not particularized but is rather a generalized grievance. Unlike in *Coleman*, in which the plaintiff-legislators' votes would have been sufficient to defeat the contested legislation, Senator Paul has not pleaded that his vote on its own would have been sufficient to forestall the IGAs. Rather, Senator Paul has a remedy in the legislature, which is to seek repeal or amendment of FATCA itself, under the aegis of which Treasury is executing the IGAs.[9] Senator Paul therefore lacks legislative standing to challenge the IGAs. None of the other Plaintiffs have alleged injuries that are traceable to the IGAs. The other Plaintiffs thus also lack standing to challenge the IGAs.

### 3. *No Plaintiff Has Standing to Challenge the FBAR*

Although most Plaintiffs have alleged foreign account balances over $10,000 so as to be subject to the FBAR requirement, no Plaintiff has alleged *both* an intent to violate the FBAR requirement *and* a credible threat of the imposition of a failure-to-file penalty, as *Driehaus* would require in order for there to be standing to bring a pre-enforcement challenge to the FBAR

---

[9]We note that Senator Paul introduced a bill to repeal FATCA in April 2017. S. 869, 115th Cong. (2017).

penalty. Other than Zell, no Plaintiff has alleged any intent to violate the FBAR requirement. Zell has alleged that he "is not currently complying with" the FBAR. Amended Compl. 34. But Zell has not alleged any facts that would show a credible threat of enforcement against him. Even if there were a credible threat of enforcement, the FBAR penalty is a discretionary penalty under 31 U.S.C. § 5321(a)(5)(A). Zell has not alleged any facts that show that the Willfulness Penalty, as opposed to the lower ordinary penalty (which Plaintiffs do not challenge, *see* Part I.B.4, *supra*), would be imposed for Zell's noncompliance with the FBAR.

Further, no Plaintiff has alleged any *actual* injury arising from the FBAR other than Lois Kuettel. Lois has alleged that she would like to have a college-savings account placed in her name that her father is currently holding for her benefit in his own name, but that her father does not want to transfer the account to her for fear that it will trigger an FBAR requirement for Lois. This injury, however, is traceable to Daniel Kuettel's personal choice not to transfer the account, and not to the FBAR.

In sum, none of the plaintiffs have standing to sue, and the district court was correct to dismiss their suit.

**III**

**The District Court Properly Denied Leave to Amend**

We generally review a district court's decision to deny leave to file an amended complaint, other than amendments as a matter of course under Fed. R. Civ. P. 15(a)(1), for abuse of discretion. *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 342 F.3d 634, 644 (6th Cir. 2003). When a district court bases its denial of a motion to amend "on the legal conclusion that the proposed amendment would not survive a motion to dismiss," however, we review the district court's decision de novo. *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 522 (6th Cir. 1999). Here, even if Plaintiffs were granted leave to amend their complaint in order to bring claims by Katerina Johnson, Lois Kuettel, and Richard Adams, and in order to plead additional facts such as some of the Plaintiffs' account balances, no plaintiff would have standing to bring any of the claims in the proposed amended complaint for the reasons set forth above. The district court thoroughly reviewed all of the proposed new parties and proposed new claims in

the amended complaint, and the district court properly held that leave to amend would be futile. Accordingly, we affirm the ruling of the district court denying Plaintiff's motion for leave to amend.

**CONCLUSION**

FATCA imposes far-reaching reporting obligations on individuals and financial institutions, which, like many government regulations, undoubtedly exact monetary and other costs of compliance. The IGAs, to be sure, are part of an unprecedented scheme of international tax enforcement. And the FBAR Willfulness Penalty, if it were to be imposed, is admittedly steep: it could theoretically bring a $100,000 fine for failure to report a foreign account with a balance of $10,000.01.

None of these considerations, however, help these Plaintiffs at this time to clear the initial jurisdictional hurdle of standing.

Accordingly, we **AFFIRM** the judgment of the district court, and we **DENY** as moot Defendants' motion to strike.