RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0164p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

STATE OF TENNESSEE, by and through the Tennessee
General Assembly, et al.,
          *Plaintiffs-Appellants*,

          *v.*

UNITED STATES DEPARTMENT OF STATE, et al.,
          *Defendants-Appellees*.

No. 18-5478

─────────────────

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 1:17-cv-01040—S. Thomas Anderson, District Judge.

Argued: March 19, 2019

Decided and Filed: July 24, 2019

Before: COLE, Chief Judge; and BOGGS, Circuit Judge.[*]

─────────────────

## COUNSEL

**ARGUED:** John J. Bursch, BURSCH LAW PLLC, Caledonia, Michigan, for Appellants. Samantha L. Chaifetz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Richard Thompson, B. Tyler Brooks, Kate Oliveri, THOMAS MORE LAW CENTER, Ann Arbor, Michigan, for Appellants. Samantha L. Chaifetz, Alisa B. Klein, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. Sarah Grusin, NATIONAL HEALTH LAW PROGRAM, Carrboro, North Carolina, Cody Wofsy, AMERICAN CIVIL LIBERTIES UNION FOUNDATION IMMIGRANTS' RIGHTS PROJECT, San Francisco, California, for Amici Curiae.

─────────────────

[*]After oral argument, Judge Julia Smith Gibbons was unavailable to participate in the panel's decision. Chief Judge Cole and Judge Boggs act as a quorum pursuant to 28 U.S.C. § 46(d).

---

**OPINION**

---

BOGGS, Circuit Judge.   This case presents the question of whether the Tennessee General Assembly ("General Assembly") has standing to file suit on its own behalf, as well as on behalf of the State of Tennessee.   The General Assembly alleged that the federal government violated the Spending Clause and the Tenth Amendment to the United States Constitution through enacting and implementing certain statutes that require states to provide Medicaid coverage to eligible refugees.   The district court dismissed the General Assembly's complaint for lack of standing.  *Tennessee v. U.S. Dep't of State*, 329 F. Supp. 3d 597, 616–17 (W.D. Tenn. 2018).   Because the General Assembly has not alleged an injury that gives it standing, and because the General Assembly has not established that it has the authority to bring suit on behalf of Tennessee, we affirm the district court's judgment.

## STATUTORY BACKGROUND

Before turning to the parties' arguments, we briefly discuss the statutory schemes that are relevant to this case.   In 1980, Congress amended the Immigration and Nationality Act by passing the Refugee Act, Pub. L. No. 96-121, 94 Stat. 102 (1980) (codified in scattered sections of 8 U.S.C.).   The Refugee Act created the Office of Refugee Resettlement ("ORR") within the Department of Health and Human Services ("HHS").[1]  8 U.S.C. § 1521(a).   ORR administers the Refugee Resettlement Program.  *See id.* (b).   ORR consults with state and local governments and private nonprofit agencies concerning "the sponsorship process and the intended distribution among the States and localities before their placement in those States and localities."   8 U.S.C. § 1522(a)(2)(A).   The parties do not dispute that states cannot prevent the federal government from settling refugees within their borders.  *See Tennessee*, 329 F. Supp. 3d at 607 (citing H.R.

---

[1]The Bureau of Population, Refugees, and Migration within the United States Department of State determines whether refugees are eligible for resettlement within the United States.  *Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 724–25 (S.D. Ind. 2016).   This process can take eighteen to twenty-four months.  *Id.* at 725.

Rep. No. 132, at 19 (1985)); *see also Exodus Refugee Immigration, Inc. v. Pence*, 838 F.3d 902, 904 (7th Cir. 2016).

The Refugee Resettlement Program assists refugees in achieving economic self-sufficiency in the United States through federal grants to provide employment training, English-language education, and other skill development.  8 U.S.C. § 1522(a)(1)(A); *Exodus Refugee Immigration*, 838 F.3d at 903; 45 C.F.R. § 400.11.  States may choose to administer this program.  To participate, a state must submit a proposal for ORR's approval, describing how the state will "coordinate cash and medical assistance and other services to promote refugee resettlement and economic self-sufficiency."  *Tennessee*, 329 F. Supp. 3d at 607; 8 U.S.C. § 1522(a)(6)(A)–(C); 45 C.F.R. § 400.4.  If a state chooses not to participate, or withdraws from participation, then the state does not receive or administer the grant funding.  45 C.F.R. § 400.301.  ORR may then "authorize a replacement designee or designees to administer the provision of assistance and services, as appropriate, to refugees in that State."  *Id.* (c); *see also* 8 U.S.C. § 1152(c)(1)(A), (e)(1); *Exodus Refugee Immigration*, 838 F.3d at 905; 60 Fed. Reg. 33584, 33588 (June 28, 1995).  ORR funds thirteen such programs in twelve states.  *Tennessee*, 329 F. Supp. 3d at 608.

The Refugee Act authorizes, but does not require, ORR to reimburse states, subject to available appropriations, "for 100 per centum of the cash assistance and medical assistance provided to any refugee" during the first three years of the refugee's residence in the United States.  8 U.S.C. § 1522(e)(1); *see also Tennessee*, 329 F. Supp. 3d at 607.  "[B]y the early 1990s, ORR no longer reimbursed the states for the full cost of providing cash and medical assistance to refugees due to an insufficiency of funds appropriated for that purpose." *Tennessee*, 329 F. Supp. 3d at 607.  ORR amended the program regulations in light of the "steady decline in Federal refugee funding for the State share of . . . Medicaid . . . due to insufficient appropriated funds."  60 Fed. Reg. 33584, 33588 (June 28, 1995).

Medicaid is a "cooperative federal-state public assistance program that makes federal funds available to states electing to furnish medical services to certain impoverished individuals."  *Mowbray v. Koslowski*, 914 F.2d 593, 595 (4th Cir. 1990).  Medicaid assists states in providing medical care to "pregnant women, children, needy families, the blind, the elderly,

and the disabled . . . ." *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 541 (2012). Participation in Medicaid is voluntary, but to receive federal funding, states must have an approved state Medicaid plan satisfying federal criteria that establish who is eligible for care, the services provided, and the cost of services. *Id.* at 541–42; *see also* 42 U.S.C. § 1396a(10); 42 C.F.R. § 430.10. Tennessee has participated in Medicaid since 1968. *Tennessee*, 329 F. Supp. 3d at 605.

A state must submit its Medicaid plan, or any proposed amendments, to the Centers for Medicare & Medicaid Services ("CMS") for approval. 42 C.F.R. § 430.12. Once the plan is approved, the state receives reimbursement from the federal government for a percentage of the costs of providing care to eligible individuals: the "Federal Medical Assistance Percentage" ("FMAP"). *West Virginia v. U.S. Dep't of Health & Human Servs.*, 289 F.3d 281, 284 (4th Cir. 2002); *see also* 42 U.S.C. § 1396d(b). If a state plan is not in compliance with the Medicaid Act's requirements, "after reasonable notice and opportunity for hearing," HHS may withhold the state's FMAP or limit the FMAP to the parts of the state plan that are not affected by noncompliance. 42 U.S.C. § 1396c. The Medicaid Act provides for a system of administrative and judicial review for HHS's decisions concerning state plans and a determination to reduce or withhold a state's FMAP.**2** *See* 42 U.S.C. § 1316. Medicaid spending accounts for a substantial portion of the average state's budget, and the FMAP covers "50 to 83 percent of those costs." *NFIB*, 567 U.S. at 581. In recent years, Tennessee's annual FMAP has ranged from four to seven billion dollars, which represents 17 to 21% of the state's total budget for all purposes.

The original Medicaid Act "was . . . silent on the availability of Medicaid to aliens." *Lewis v. Thompson*, 252 F.3d 567, 571 (2d Cir. 2001). In 1971, the Supreme Court held in

---

**2**The General Assembly argues that it faces the potential consequence of a loss of its FMAP. CMS may withhold payments to a state only after providing "reasonable notice and opportunity for a hearing," if CMS finds that the plan is no longer in compliance or that the administration of the plan fails to substantially comply with the Medicaid Act. 42 U.S.C. § 1396c; 42 C.F.R. § 430.35(a). A hearing is "generally not called until a reasonable effort has been made to resolve the issues through conferences and discussions." 42 C.F.R. § 430.35(a). The Code of Federal Regulations identifies the procedure for a hearing. *See* 42 C.F.R. §§ 430.60–104. CMS's decision is final agency action. 42 C.F.R. § 430.102(c). The decision must specify whether a state's FMAP will be withheld entirely or in part, as well as the effective date. 42 C.F.R. 430.104(a). CMS may still, however, consult with the parties on the question of further payments. *Id.* (b). Federal funds cannot be withheld earlier than the date of the decision, and no later than "the first day of the next calendar quarter." *Id.* (c). CMS's final determinations are subject to judicial review by the United States Court of Appeals for the circuit in which the state is located. 42 U.S.C. § 1316(a)(3).

*Graham v. Richardson*, 403 U.S. 365, 376 (1971), that states violated the Equal Protection Clause of the Fourteenth Amendment by denying public assistance to noncitizens on that basis, or because the noncitizen had not resided in the United States for a certain number of years. Following *Graham*, HHS proposed a rule to implement the decision that was also consistent with recent amendments to the Social Security Act that denied Social Security benefits to noncitizens. *See* 38 Fed. Reg. 16910, 16910–11 (June 27, 1973); *see also Lewis*, 252 F.3d at 571. The rule, codified at the time at 45 C.F.R. § 248.50 (1974), required states that participated in Medicaid to provide benefits to eligible noncitizens "lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law[.]" 38 Fed. Reg. 30259, 30259 (Nov. 2, 1973). A noncitizen's eligibility for Medicaid depended on whether the noncitizen fit the criteria for coverage in the Medicaid Act.

In 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act, Pub. L. No. 104-193, 110 Stat. 2015 (1996). The Act restricts the availability of public benefits for noncitizens to promote self-sufficiency as part of the United States' national immigration policy. *See* 8 U.S.C. § 1601(5)–(6). To that end, the Act provided that "an alien who is not a qualified alien . . . is not eligible for any Federal public benefit[.]" 8 U.S.C. § 1611(a); *see also Bruns v. Mayhew*, 750 F.3d 61, 63–64 (1st Cir. 2014). "Qualified alien" is defined at 8 U.S.C. § 1641(b)–(c), and includes, *inter alia*, "a refugee who is admitted to the United States under section 207 of [the Immigration and Nationality] Act." *Id.* (b)(3). Most qualified aliens are subject to additional restrictions on federal program participation. *See* 8 U.S.C. §§ 1612(a)(1), 1613(a). Five years after entry into the United States, qualified aliens may be able to participate in certain federal programs, if they are eligible, including Medicaid. *Tennessee*, 329 F. Supp. 3d at 606. Congress identified some classes of qualified aliens,[3] including refugees, who may participate in identified federal programs, including Medicaid, immediately upon admission to the United States, until seven years *after* the refugee was admitted to the United States. 8 U.S.C. § 1612(a)(2)(A)(i).

---

[3]*See* 8 U.S.C. § 1612(a)(2)(A)(i)–(v), (B)–(D) (identifying qualified aliens, including refugees, who may participate in certain federal programs).

Therefore, if a state participates in Medicaid, it "must determine a refugee applicant's eligibility for Medicaid as medically needy[,]" and provide assistance "to all refugees eligible under its State plans." 45 C.F.R. § 400.94(b)–(c). If the refugee is in one of the groups that must be covered, *see* 8 U.S.C. § 1396a(10), then the refugee's status as a noncitizen does not bar the refugee from receiving Medicaid. *See* 8 U.S.C. § 1612(a)(2)(A)(i); 45 C.F.R. § 400.94(c). If a refugee is not eligible for Medicaid under a state plan, then the refugee may be eligible for the federally funded Refugee Medical Assistance Program. 45 C.F.R. § 400.94(d).

## FACTUAL AND PROCEDURAL HISTORY

Tennessee withdrew from participation in the Refugee Resettlement Program in 2008. *Tennessee*, 329 F. Supp. 3d at 608. ORR designated the Catholic Charities of Tennessee, and its subsidiary the Tennessee Office for Refugees, to administer refugee services in Tennessee. *Ibid.* The General Assembly asserts that, from the time of the state's withdrawal until 2016, the federal government resettled more than 13,000 refugees in Tennessee. Refugees who satisfy eligibility criteria can enroll in TennCare, Tennessee's Medicaid program. The General Assembly states in its complaint that in 2015, it spent over $31 million dollars in state funds "to support the federal refugee resettlement program through TennCare."

In 2016, the General Assembly passed Senate Joint Resolution 467 ("SJR 467"), directing the Tennessee Attorney General[4] to "initiate or intervene" in a civil action on behalf of Tennessee for alleged violations of the Tenth Amendment with respect to the operation and implementation of the Refugee Resettlement Program. S. Res. 467, 109th Gen. Assembly, at 3 (Tenn. 2016). SJR 467 stated that if the Attorney General declined to file suit, then "the Speaker of the Senate and the Speaker of the House of Representatives are authorized to employ outside counsel to commence a civil action effectuating the purposes of this resolution." *Id.* at 4. The General Assembly sent SJR 467 to the Governor of Tennessee. He returned it without his signature. The Governor explained in an accompanying statement that he "trust[ed] the Attorney General to determine whether the state has a claim in this case or in any other," and noted his

---

[4]The formal title of Tennessee's Attorney General is "Attorney General and Reporter." *See Tennessee ex rel. Comm'r of Transp. v. Medicine Bird Black Bear White Eagle*, 63 S.W.3d 734, 772 n.58 (Tenn. Ct. App. 2001). This opinion uses a shortened version of the Attorney General's title.

"constitutional concerns about one branch of government telling another what to do."   The General Assembly took no further legislative action on SJR 467.

The Attorney General did not file suit.  In a letter to the General Assembly, he explained that he thought that the Tenth Amendment theories "that underpin SJR 467 are unlikely to provide a viable basis for legal action."  Letter from Herbert H. Slatery, III, Attorney General and Reporter, Tennessee, to Tennessee Senate Chief Clerk Russell Humphrey and Tennessee House of Representatives Chief Clerk Joe McCord, at 3 (July 5, 2016) (hereinafter "Slatery Letter").  The Attorney General then, "to the extent allowed by Tennessee law delegate[d his] constitutional . . . and statutory . . . authority to commence litigation on behalf of the State of Tennessee to staff counsel for the General Assembly for the limited purpose of pursuing litigation to address the issues raised in SJR 467 in the manner provided for by SJR 467."  *Id.* at 4.

The General Assembly, acting for itself and on behalf of Tennessee, along with two members of the Tennessee General Assembly, Senator John Stevens and Representative Terri Lynn Weaver, in their official and individual capacities, filed suit in the Western District of Tennessee against the United States Department of State, HHS, ORR, and several federal government officials in their official capacities (collectively "State Department").[5]  It alleged that, despite Tennessee's withdrawal from the Refugee Resettlement Program, the federal government "coerced" Tennessee to continue funding the program "by threatening the state with the loss of federal Medicaid funding."  The General Assembly claimed that, because Tennessee must enroll eligible refugees in TennCare, the state "is forced to expend substantial amounts of state taxpayer money to fund the resettlement program" despite its withdrawal.  It asserted that 42 U.S.C. § 1396c represents impermissible coercion, because if Tennessee does not enroll eligible refugees in TennCare, Tennessee could lose of 20% of its state budget.[6]  The General

---

[5]The General Assembly sued Secretary of State Michael Pompeo, Principal Deputy Assistant Secretary of State for Population, Refugees, and Migration Carol Thompson O'Connell, Secretary of HHS Alex Azar II, and the Director of the ORR, E. Scott Lloyd.

[6]Tennessee has not attempted to alter its state Medicaid plan.  The General Assembly has not passed any legislative measures that would bar refugees from receiving TennCare.  *See Tennessee v. U.S. Dep't of State*, 329 F. Supp. 3d 597, 618 (W.D. Tenn. 2018).   The complaint does not allege that CMS has threatened to remove Tennessee's FMAP, other than the fact that 42 U.S.C. § 1396c exists.

Assembly sought a declaratory judgment that the State Department had violated the Spending Clause and Tenth Amendment in its implementation of the Refugee Act. It also requested injunctive relief prohibiting the federal government from settling refugees in Tennessee until the United States paid for all resettlement costs, and to compel the State Department to comply with the Spending Clause and the Tenth Amendment by "fund[ing] refugee resettlement from federal dollars and without any involuntary contribution from the State of Tennessee[.]"

The State Department moved to dismiss for lack of subject-matter jurisdiction. It asserted that the General Assembly and the individual legislators lacked Article III standing, and challenged the General Assembly's authority to bring suit on behalf of the state of Tennessee. *Tennessee*, 329 F. Supp. 3d at 610. The State Department disputed that the case was ripe because Tennessee had not amended its Medicaid plan, and so did not actually face the loss of its FMAP. *Id.* at 617. The State Department also contended that 42 U.S.C. § 1316 of the Medicaid Act precluded district-court review of the General Assembly's claims. *Tennessee*, 329 F. Supp. 3d at 619. Finally, it also moved to dismiss for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6), because the General Assembly had not shown that Tennessee's obligation to provide Medicaid to eligible refugees violated the Tenth Amendment or that the possible loss of Tennessee's FMAP for failure to comply was an unconstitutionally coercive exercise of Spending Clause power. *Tennessee*, 329 F. Supp. 3d at 621. The district court granted the State Department's motions.[7] *Id.* at 629. This appeal followed.

## ANALYSIS

The General Assembly argues that the district court erred in its conclusion that it lacked subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1) when it ruled that: (1) no plaintiff had standing; (2) the controversy was not ripe for review; and (3) 42 U.S.C. § 1316 precluded its review. It also argues that the district court erred in granting the State Department's motion to

---

[7]Three organizations that assist refugees, the Tennessee Immigrant and Refugee Rights Coalition, Bridge Refugee Services Inc., and the Nashville International Center for Empowerment, moved to intervene. The district court denied that motion as moot when it granted the State Department's motion to dismiss. *See Tennessee*, 329 F. Supp. 3d at 604. These organizations, as well as the National Health Law Program and the National Immigration Law Center, have filed *amicus* briefs.

dismiss for failure to state a claim upon which relief could be granted. The State Department asks us to affirm the district court.

## Standard of Review

We review the district court's decision to dismiss for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) *de novo*. *Cartwright v. Garner*, 751 F.3d 752, 760 (6th Cir. 2014). We review the district court's factual findings for clear error and its application of the law to the facts *de novo*. *Ibid.* We also review a district court's dismissal of a complaint under Fed. R. Civ. P. 12(b)(6) *de novo*. *Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 605 (6th Cir. 2005).

## Standing

The first issue we must analyze is whether the General Assembly has standing. Article III, § 2 of the Constitution provides that the judicial power of the United States "extends only to 'Cases' and 'Controversies.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting U.S. Const. Art. III, § 2). Standing "ensure[s] that federal courts do not exceed their authority" and "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Ibid.* The "irreducible constitutional minimum of standing" requires the plaintiff to show three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

> [A] plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). When a case "is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Spokeo*, 136 S. Ct. at 1547 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). "[I]n all standing inquiries, the critical question is whether at least one petitioner has 'alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction.'" *Horne v. Flores*, 557 U.S. 433, 445 (2009) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)) (emphasis in original). Standing is a jurisdictional

requirement. *See Coal Operators & Assocs., Inc. v. Babbitt*, 291 F.3d 912, 915 (6th Cir. 2002). If no plaintiff has standing, then the court lacks subject-matter jurisdiction. *See Lyshe v. Levy*, 854 F. 3d 855, 857 (6th Cir. 2017). When a court lacks jurisdiction, it "cannot proceed at all in any cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)). Therefore, if the General Assembly lacks standing (acting for itself or on behalf of the state), and the individual legislators lack standing, we need not reach the other issues: ripeness, statutory preclusion, and failure to state a claim upon which relief can be granted.

*Legislative Standing: The General Assembly's Standing to Sue on its own Behalf*

Courts have grappled with the complicated question of when a legislative body, or a group of legislators from that body, has standing to sue. Like all standing questions, that analysis begins with the requirement of a concrete and particularized injury that is actual or imminent. *See Spokeo*, 136 S. Ct. at 1548. An injury satisfies these criteria when the injury affects the plaintiff in a personal and individual way, and actually exists, even if the injury is intangible. *Id.* at 1548–49. A legislative body may, in some circumstances, sue as an institutional plaintiff if it has suffered an institutional injury. *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2664 (2015). An institutional injury "constitutes some injury to the power of the legislature as a whole rather than harm to an individual legislator." *Kerr v. Hickenlooper*, 824 F.3d 1207, 1214 (10th Cir. 2016). Such an injury is not confined to a single legislator, or a small group, but affects each member of the body equally. *Ibid.* Assessing whether a legislative body has suffered an institutional injury sufficient for Article III standing turns on the facts and circumstances of the particular case.

Two Supreme Court cases illustrate when a portion of a legislative body may have standing, *see Coleman v. Miller*, 307 U.S. 433 (1939),[8] and when the entire legislative body has

---

[8]Chief Justice Hughes wrote "the Opinion of the Court." *Coleman v. Miller*, 307 U.S. 433, 435 (1939). Justices Black, Roberts, Frankfurter, and Douglas concurred in the judgment, although they did not think that the petitioners had standing. *See id.* at 456 (Black, J., concurring); *id.* at 460 (opinion of Frankfurter, J.). Justices Butler and McReynolds dissented on the merits. *See id.* at 470–74 (Butler, J., dissenting). In *Raines v. Byrd*, 521 U.S. 811, 822 n.5 (1997), the Supreme Court concluded that Chief Justice Hughes's opinion on standing controlled because Justices Butler and McReynolds must have joined the opinion on standing. Otherwise, the Court explained, Justice Frankfurter would have written the opinion of the court because only two Justices joined Chief Justice Hughes's

standing.  *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652 (2015).  *Coleman* presented a challenging question concerning legislative standing, as well as the Supreme Court's jurisdiction.  In 1937, the Kansas Senate voted for the second time on whether to ratify the Child Labor Amendment to the U.S. Constitution.[9]  *Coleman*, 307 U.S. at 435–36. The Kansas Senate tied 20-20, and the Lieutenant Governor, as the presiding officer, cast a tie-breaking vote in favor of ratification.  Twenty-one Kansas state senators sought a writ of mandamus in the Supreme Court of Kansas challenging the Lieutenant Governor's right to cast the deciding vote, as well as whether the Child Labor Amendment could still be ratified.  *Id.* at 436.  The Supreme Court of Kansas denied the writ, and the Supreme Court of the United States granted certiorari.  *Id.* at 436–37.  As a threshold matter, the Supreme Court considered whether the senators had standing to seek review of the decision of the Supreme Court of Kansas.[10]  *Id.* at 437.

The Supreme Court observed that "the plaintiffs include twenty senators, whose votes against ratification have been overridden and virtually held for naught although if they are right in their contentions their votes would have been sufficient to defeat ratification."  *Id.* at 438.  The senators, the Court explained, had a "plain, direct and adequate interest in maintaining the effectiveness of their votes."  *Ibid.*  In support of this conclusion, the Court examined past cases in which it had recognized that federal and state officials and administrative commissions had a legitimate interest in resisting attempts to prevent enforcement of statutes that confer official duties on the officials and commissions.  *Id.* at 441–42.  The state official did not need to have suffered a personal injury because, if he had a duty to enforce the statute, then he had an interest in a federal case that considered whether the statute was constitutional.  *See id.* at 443–45.  The Court also pointed out that it had found standing when citizens challenged whether certain

opinion on the merits.  *Ibid.*  The Supreme Court has treated Chief Justice Hughes's opinion as controlling in other cases.  *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2665 & n.13 (2015) (discussing *Coleman* in relation to legislative standing), *but see id.* at 2696–97 (Scalia, J., dissenting) (contending that *Coleman* was "a peculiar case that may well stand for nothing").

[9]The Kansas Senate had initially adopted a resolution rejecting the amendment in 1925.  *Coleman*, 307 U.S. at 435.

[10]The Supreme Court of Kansas had concluded that the senators had standing to sue because the Kansas Senate had passed a resolution directing Kansas's Attorney General to appear on behalf of the state, and Kansas joined the case as a party defendant.  *Coleman*, 307 U.S. at 437 & n.2.

exercises of state legislative power were consistent with federal constitutional requirements. *Id.* at 445–46. The Court concluded:

> In the light of this course of decisions, we find no departure from principle in recognizing in the instant case that at least the twenty senators whose votes, if their contention were sustained, would have been sufficient to defeat the resolution ratifying the proposed constitutional amendment, have an interest in the controversy which, treated by the state court as a basis for entertaining and deciding the federal questions, is sufficient to give the Court jurisdiction to review that decision.

*Id.* at 446.

*Coleman* mingled its federal-question jurisdiction and Article III standing analyses. Even so, subsequent cases examining *Coleman* have identified some at least one core principle concerning legislative-body standing. Courts have concluded that, on the question of whether members of a legislative body have standing, *Coleman at most* held that "legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Raines v. Byrd*, 521 U.S. 811, 823 (1997) (footnote omitted). *See also Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 453–54 (6th Cir. 2017) ("An apparent exception to the general rule against legislative standing arises when the legislators are suing on a vote-nullification theory and allege that if their votes had been given effect, those votes would have been sufficient to defeat or enact a specific legislative action."); *Baird v. Norton*, 266 F.3d 408, 412 (6th Cir. 2001) (holding that a member of the Michigan House and a Michigan state senator did not have standing to challenge gaming compacts approved by a concurrent-resolution procedure because neither plaintiff could show that his or her individual vote could have defeated the compacts under another procedure).

The Supreme Court considered whether a legislative body could raise a nullification claim in *Arizona State Legislature*. Arizona voters adopted Proposition 106, which amended the Arizona Constitution by removing the Arizona Legislature's redistricting authority and vesting it in an independent commission. 135 S. Ct. at 2658. The Legislature sued, alleging that Proposition 106 and the commission's redistricting activities deprived the Legislature of its constitutional authority over redistricting, in violation of the Elections Clause of the U.S.

Constitution. *Id.* at 2658–59 (citing U.S. Const. art. I § 4, cl.1).  The Supreme Court considered whether the Legislature had alleged an injury that was sufficiently concrete to meet Article III's standing requirements.  *Id.* at 2663.

The Court rejected the argument that, absent an attempt at redistricting, the Legislature lacked standing.  *Id.* at 2663–64.  If the Legislature had to pass a redistricting plan and seek to implement it, it would have to violate the Arizona Constitution (by passing an act that superseded a proposition), *and* show that the Secretary of State, who could only constitutionally implement the commission's certified maps, would be likely to violate the Arizona Constitution by implementing the Legislature's map.  Such a showing, the Court concluded, was unnecessary to demonstrate an injury concrete enough for standing.  *Id.* at 2664.

In assessing whether the Legislature had standing, the Court compared the Legislature's claims with the claims in *Coleman* and *Raines*.  In *Raines*, the Supreme Court considered whether six members of Congress had standing to challenge the constitutionality of the Line Item Veto Act.  521 U.S. at 814.  The Court observed that the members of Congress did not assert a personal injury.  Instead, they claimed that the Line Item Veto Act caused "a type of institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally."  *Id.* at 821.  The nature of that injury did not permit the members to claim a "personal stake" in the suit and the alleged injury was not "sufficiently concrete" to establish Article III standing.  *Id.* at 830.

The Supreme Court concluded that these facts distinguished the Arizona Legislature's claimed injury from the one in *Raines*.  *Ariz. State Legislature*, 135 S. Ct. at 2664.  By contrast, the Arizona Legislature was "an institutional plaintiff asserting an institutional injury and it commenced this action after authorizing votes in both of its chambers . . . ."  *Ibid.*  The Arizona Legislature's injury, the Court reasoned, was more similar to the "nullification" injury in *Coleman*.  *Id.* at 2665.  Proposition 106, along with the Arizona Constitution's bar on allowing the Legislature to undermine the purpose of an initiative, "would 'completely nullif[y]' any vote by the Legislature now or 'in the future,' purporting to adopt a redistricting plan."  *Ibid.* (quoting *Raines*, 521 U.S. at 823–24).  Accordingly, the Court concluded, there was a sufficiently

concrete injury to the Legislature's interest in redistricting (a power the Legislature claimed derived from the U.S. Constitution) that the Legislature had Article III standing. *Id.* at 2665–66.

The General Assembly argues that its circumstances are "virtually identical" to those in *Arizona State Legislature* because a majority of the General Assembly passed SJR 467. It claims that the definitive criteria for legislative standing "boils down to pure numbers." Under the General Assembly's standing theory, "[l]egislators have standing to sue on behalf of the legislative body where 51% of the members of the legislative body vote to authorize the lawsuit." It argues that it has sufficiently alleged an injury, "deprivation and nullification" of its legislative powers, because its complaint alleged "that the federal refugee resettlement program and the mandates to fund programs and healthcare for refugees through Medicaid completely nullify the General Assembly's votes to appropriate state funds as is its right and obligation under the Tennessee Constitution." The General Assembly emphasizes that "the underlying cause of action itself—the Tenth Amendment to the United States Constitution—makes it clear that Defendants are infringing on the State's sovereignty and nullifying its powers."

None of the cases the General Assembly relies on demonstrate that "pure numbers" or a majority of votes on a resolution to file suit confers standing on an institutional body. A vote tally is relevant in analyzing whether the legislators have a *Coleman* nullification claim, or if an individual legislator had been designated as the body's representative. *See Kerr*, 824 F.3d at 1215 ("In determining whether a party may rely on an institutional injury to demonstrate standing, the [Supreme] Court has considered whether the plaintiffs represent their legislative body as an institution."). *Raines* "attach[ed] some importance" to the fact that the Senate and House had not authorized any of the six plaintiffs to represent their Houses of Congress, and in fact, Congress "actively oppose[d]" the suit." 521 U.S. at 829; *see also Ariz. State Legislature*, 135 S. Ct. at 2664. *Raines* also noted that the six plaintiffs did not form a sufficient bloc to bar the enactment of the Line Item Veto Act, unlike in *Coleman*. 521 U.S. at 822–24. Similarly, *Arizona State Legislature*, 135 S. Ct. at 2664, observed that the Arizona Legislature had brought suit as an institution after authorizing votes.

*Raines* and *Arizona State Legislature* are not just about numbers. What *Raines* demonstrates is that individual legislator plaintiffs cannot bring suit for an alleged institutional

injury. 521 U.S. at 821. But an institutional body can bring suit for such an alleged injury. *Ariz. State Legislature*, 135 S. Ct. at 2664. *See also Kerr*, 824 F.3d at 1214 ("Viewing [*Raines*, *Coleman*, and *Ariz. State Legislature*] together, individual legislators may not support standing by alleging only an institutional injury."). SJR 467 lends support to the General Assembly's claim that it brings suit as an institutional body, as well as the individual legislators' claims to standing as the General Assembly's authorized representatives. *See United States v. AT&T*, 551 F.2d 384, 391 (D.C. Cir. 1976) (noting House of Representatives resolution authorizing intervention of congressman on behalf of a congressional subcommittee and the House of Representatives). But SJR 467, by itself, is not sufficient to confer Article III standing. *See Ariz. State Legislature*, 135 S. Ct. at 2664; *Kerr*, 824 F.3d at 1216. An institutional plaintiff must still satisfy Article III's standing requirements. To have standing, the General Assembly must have alleged that it has suffered "an actual or imminent injury that is traceable to the defendant and redressable by the court." *Crawford*, 868 F.3d at 452.

To determine whether the General Assembly's alleged injury satisfies that criteria, it is helpful to delve further into what constitutes a concrete "institutional injury" for standing, beyond a claim that an injury that is directed towards the legislative body and affects all members equally. *See Ariz. State Legislature*, 135 S. Ct. at 2664; *Raines*, 521 U.S. at 821; *Kerr*, 824 F.3d at 1215. In both *Coleman* and *Arizona State Legislature*, the injury "reside[d] in the disruption of the legislative process . . . ." *U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 67 (D.D.C. 2015). The plaintiffs in both *Coleman* and *Arizona State Legislature* had alleged that an action at the state legislative level had interfered with their federal constitutional prerogatives. *Coleman* is not *precisely* an "institutional injury" case—rather, it is a claim by some legislators that *state* procedural irregularities undermined their duty under the U.S. Constitution and nullified their votes. 307 U.S. at 438. Similarly, in *Arizona State Legislature*, the Legislature argued that Proposition 106, was inconsistent with the Elections Clause of the U.S. Constitution, which the Legislature claimed vested it with the responsibility for redistricting. 135 S. Ct. at 2663.

Other cases finding that a legislative body alleged a concrete institutional injury, and so had standing, similarly centered on a disruption to that body's specific powers. In *AT&T*, the

United States Court of Appeals for the District of Columbia Circuit concluded that the House of Representatives had standing to intervene in a suit that the Department of Justice had filed to block AT&T from complying with a House subcommittee subpoena. 551 F.2d at 391. The court held, after a brief analysis, that "the House as a whole has standing to assert its investigatory power, and can designate a member to act on its behalf." *Ibid.* In *Burwell*, the district court held that the House of Representatives had alleged a concrete, particularized injury that satisfied standing through its claim that the Executive Branch had violated the Constitution by drawing funds from the Treasury without a valid appropriation. 130 F. Supp. 3d at 74. The district court emphasized that circumventing the appropriations process deprived Congress "of its constitutional role" and caused an injury "in a more particular and concrete way." *Id.* at 75. These cases demonstrate that interference with a legislative body's specific powers, such as its ability to subpoena witnesses, or a constitutionally assigned power, may create an injury that is concrete enough for Article III standing. *See Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1955 n.6 (2019) (observing that the House has an "institutional interest in the *manner* in which it goes about its business") (emphasis in original). But that injury must be concrete and particularized, *see Spokeo*, 136 S. Ct. at 1548, and in *Coleman*, *Arizona State Legislature*, *AT&T*, and *Burwell*, the interference satisfied that criteria because it affected the legislative body's specific powers and either curtailed or threatened the exercise of those powers, impacting the entire legislature.

Merely alleging an institutional injury is not enough. *See Bethune-Hill*, 139 S. Ct. at 1955 (party invoking federal-court jurisdiction "bears the burden of doing more than 'simply alleg[ing] a nonobvious harm'" (quoting *Wittman v. Personhuballah*, 136 S. Ct. 1732, 1737 (2016))). In *Raines*, the Supreme Court considered more than just numbers—it examined the alleged injury. *See* 521 U.S. at 821–25. The members of Congress had argued that *Coleman* applied because, under the Line Item Veto Act, their votes on future appropriations bills would be less effective. *Id.* at 825. Before the Act, the members argued, if they passed an appropriations bill, the bill would become law, or it would not. But after the Line Item Veto Act, the members argued, the bill could become law—and the President could cancel portions of the bill. *Ibid.* *Raines* cast doubt on whether this alleged injury itself was concrete enough to confer standing. *See id.* at 829 ("[T]he institutional injury they allege is wholly abstract and widely

dispersed . . . ."). The Court concluded that this did not represent "vote nullification" as in *Coleman*, but rather a complaint about an "abstract dilution of legislative power." *Id.* at 826.

The District of Columbia Circuit considered a problem similar to the one before this court, in *Alaska Legislative Council v. Babbitt*, 181 F.3d 1333 (D.C. Cir. 1999). The Alaska Legislative Council, composed of certain members of the Alaska Legislature, and other members of the Legislature sued the Secretary of the Interior, alleging that federal management of federal public lands in Alaska under the Land Conservation Act infringed on Alaska's authority in violation of the Tenth Amendment. *Id.* at 1335. The Council alleged that because the Alaska Constitution conferred an affirmative duty on the state's legislators to legislate and manage state natural resources, the federal statute interfered with those duties and "nullified their legislative prerogatives regarding fish and wildlife management." *Id.* at 1337. The court rejected the individual legislators' claims to standing because an assertion that federal law blocked the Alaska Legislature from controlling hunting and fishing on federal lands alleged a loss of political power that was attributable to the Legislature as a whole. *Id.* at 1338. But, the court observed, there was not the "slightest suggestion" that the Lands Conservation Act had overruled or nullified *any* "specific act or regulation of the Alaska Legislature . . . ." *Ibid.* The court acknowledged that the Council could sue in the name of the Legislature under Alaska law, but held that the Council's claimed injury failed. The Council's complaints were identical to those of the individual legislators. The alleged injury, that federal law interfered with the state's authority to manage its fish and wildlife, was an injury the *state* purportedly suffered. *Ibid.* If the Act "diminishe[d] the State's authority, it injures *state sovereignty*, *not legislative sovereignty*." *Id.* at 1338–39 (emphasis added).

In our case, one of the General Assembly's claimed injuries is an alleged injury to the *state*—and not the General Assembly. It asserts that the State Department is "infringing on the State's sovereignty and nullifying its powers." This claim, that the federal government is commandeering state funds to support the Refugee Resettlement Program in violation of the Tenth Amendment through a statute that permits eligible refugees to enroll in Medicaid, is, like the injury described in *Alaska Legislative Council*, an alleged injury to the state, not the legislature. *See id.* at 1338–39. This is not an injury that confers standing on the General

Assembly.  *See id.* at 1339 ("[T]he Legislature suffers no separate, identifiable, judicially cognizable injury that entitles it to sue on its own behalf.").

The General Assembly argues that its votes to appropriate state funds have been "completely nullif[ied]" through the obligation to provide Medicaid to eligible refugees.  The Tennessee Constitution vests the General Assembly with Tennessee's legislative authority and the power to appropriate funds.  Tenn. Const. art. 2, §§ 3, 24.  But the General Assembly has not alleged that it cannot pass appropriations bills,[11] and so its insistence that its circumstances are identical to those in *Arizona State Legislature* is misplaced.  The Arizona Legislature could not take *any* redistricting action without violating the Arizona Constitution—Proposition 106 removed the redistricting power—and so made the injury concrete.  *Ariz. State Legislature*, 135 S. Ct. at 2663.  The General Assembly, however, *can* pass appropriations bills, which can allocate or not allocate funds as it wishes.  But, because Tennessee voluntarily participates in Medicaid, and is required, as a condition of receiving federal funding, to cover individuals who satisfy the eligibility criteria (including refugees), the General Assembly has appropriated funds for the state share of Medicaid.  The General Assembly's objection arises from 8 U.S.C. § 1612, which permits refugees to enroll in Medicaid if they satisfy the other criteria for eligibility.

This claimed injury appears to derive, if anywhere, from the alleged injury to Tennessee's sovereignty.  *See Alaska Legislative Council*, 181 F.3d at 1338–39.  The impact on the General Assembly's obligation to appropriate funding is more akin to the alleged injury in

---

[11]At oral argument, the General Assembly fleshed out its standing argument by asserting that the injury arises from the General Assembly's inability to balance the state budget because, as refugees are settled in Tennessee, the federal government can commandeer state funds by placing more refugees in Tennessee and, as some of those refugees might be eligible for Medicaid, Tennessee would have to spend money.  This, the General Assembly asserts, forces Tennessee to disturb its budget and violate its own constitution.  The General Assembly raised this concern in the context of its complaint that Tennessee "is not consulted or informed of the number of refugees that will be resettled within its borders . . . ."  The argument about consultation (or the General Assembly's clarification about balanced budget problems) was not raised substantially in its briefs.  The General Assembly's complaint does not allege that refugee placements have caused, or threaten to cause, its budget to become unbalanced.  That something *could* happen does not satisfy the requirement of imminence.  *See Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 454–55 (6th Cir. 2017).  Further, 8 U.S.C. § 1522(a)(2) provides guidelines to ensure that the General Assembly's hypothetical, that the federal government *might* place 10,000 refugees in one state in the last two weeks of the fiscal year could not happen.  Given that from 2008 to 2016, the federal government has settled (according to the General Assembly) a total of 13,000 refugees in the state, we do not conclude that this hypothetical set of circumstances represents a threatened injury that is "real, immediate, and direct."  *Davis v. FEC*, 554 U.S. 724, 734 (2008).

*Raines*, of an abstract "loss of political power." *See* 521 U.S. at 821. The General Assembly has not identified an injury that it has suffered, such as disruption of the legislative process, a usurpation of its authority, or nullification of anything it has done, unlike in *Coleman*, *Arizona State Legislature*, or *Burwell*. The district court did not err when it concluded that the General Assembly lacked Article III standing. Its alleged injury simply does not satisfy the first element of standing. *See Spokeo*, 136 S. Ct. at 1548; *Raines*, 521 U.S. at 826. We do not address whether a suit brought by a different party resting upon an alleged injury to Tennessee's state sovereignty would satisfy Article III standing.

*The Individual Legislators' Standing*

Having concluded that the General Assembly lacks standing to sue on its own behalf, we turn to whether the individual legislators have standing. Senator Stevens and Representative Weaver filed suit in both their individual and official capacities. Before the district court, they argued that they had official-capacity standing, rather than alleging that they had suffered a personal injury that would provide them with individual-capacity standing. *See Tennessee*, 329 F. Supp. 3d at 612. Before this court, their primary argument is that, because the General Assembly has standing, that body may designate Senator Stevens and Representative Weaver to act on its behalf.

An individual legislator, or group of legislators, do not have Article III standing based on an allegation of an institutional injury, or a complaint about a dilution of legislative power because "[a]n individual legislator cannot 'tenably claim a personal stake' in a suit based on such an institutional injury." *Kerr*, 824 F.3d at 1214 (quoting *Ariz. State Legislature*, 135 S. Ct. at 2664); *see also Crawford*, 868 F.3d at 460; *Baird*, 266 F.3d at 412–13; *Alaska Legislative Council*, 818 F.3d at 1337–38. An individual legislator may, however, have standing as a representative of the legislative body. *See Kerr*, 824 F.3d at 1215–16 (explaining that an individual legislator may represent the body as an institution upon authorization); *see also Karcher v. May*, 484 U.S. 72, 81–82 (1987) (legislators intervened as representatives of the legislature); *AT&T*, 551 F.2d at 391 (House of Representatives designated member as official representative). But the legislative body must have standing to sue. *See Karcher*, 484 U.S. at

82. Because the General Assembly lacks standing, we affirm the district court's conclusion that Senator Stevens and Representative Weaver lack standing.

*The General Assembly's Standing to Sue on Behalf of the State of Tennessee*

Even though we affirm the district court's conclusion that the General Assembly lacks standing to sue on its own behalf, we must consider whether the General Assembly has standing to sue on behalf of Tennessee. The General Assembly argues that the Tennessee Constitution does not expressly provide that only the Attorney General has the exclusive power to litigate in the name of the state. It insists that, because the alleged injury to Tennessee's sovereignty primarily implicates legislative powers, it is the appropriate party to file suit, and Tennessee's separation-of-powers doctrine is flexible enough to permit the General Assembly to do so. The General Assembly also argues that SJR 467 and the Attorney General's subsequent delegation in the Slatery Letter permit it to bring suit on behalf of Tennessee.

A state may designate an agent to represent its interests in court. This is most commonly the state's Attorney General. *See Hollingsworth v. Perry*, 570 U.S. 693, 710 (2013). State law may, however, "provide for other officials to speak for the State in federal court . . . ." *Ibid.* For example, in *Karcher*, 484 U.S. at 82, two members of the New Jersey Legislature could represent New Jersey's interests in their official capacity under New Jersey law. In assessing whether the General Assembly has the authority to represent Tennessee in federal court, we must examine Tennessee law. *See Bethune-Hill*, 139 S. Ct. at 1951–52 (examining Virginia law to determine if the Virginia House of Delegates could litigate on behalf of the state); *Hollingsworth*, 570 U.S. at 712–13 (examining California law); *Arizonans for Official English v. Arizona*, 520 U.S. 43, 65 (1997) (examining Arizona law to determine if initiative sponsors can defend constitutionality of initiatives).

The Tennessee Attorney General is "the chief executive officer of the Legal Department of state government." *Tennessee ex rel. Comm'r of Transp. v. Medicine Bird Black Bear White Eagle*, 63 S.W.3d 734, 772 (Tenn. Ct. App. 2001); *see also* Tenn. Code Ann. § 4-3-111(1). The Attorney General is a constitutional officer appointed by the justices of the Tennessee Supreme

Court.**12**   Tenn. Const. art. VI, § 5.  This role carries "extensive statutory power and the broad common-law powers of the office except where these powers have been limited by statute." *Medicine Bird Black Bear White Eagle*, 63 S.W.3d at 772; *see also Tennessee v. Chastain*, 871 S.W.2d 661, 664 (Tenn. 1994); *Tennessee v. Heath*, 806 S.W.2d 535, 537 (Tenn. Ct. App. 1990).  Tennessee courts have given a broad construction to the Attorney General's statutory authority.  *See Heath*, 806 S.W.2d at 537.  They also are reluctant to authorize interference with the Attorney General's obligations.  *See Medicine Bird Black Bear White Eagle*, 63 S.W.3d at 775 (concluding that courts do not have the power to appoint lawyers to represent officers and agencies of the state government "[i]n light of the constitutional stature and statutory duties of the Attorney General").

Tennessee law provides that the Attorney General has the duty to try or direct "all civil litigated matters and administrative proceedings in which the state or any officer, department, agency, board, commission or instrumentality of the state may be interested[.]"  Tenn. Code Ann. § 8-6-109(b)(1); *see also Medicine Bird Black Bear White Eagle*, 63 S.W.3d at 772.  The Attorney General has the exclusive authority "to attend to all business of the state" in both criminal and civil matters in Tennessee's appellate courts.  Tenn. Code Ann. § 8-6-109(b)(2); *Tennessee v. Potter*, 61 S.W.3d 348, 351 (Tenn. Crim. App. 2001).  The Attorney General's exclusive authority also extends to cases in federal court.

> The attorney general and reporter *shall* attend in person, or by assistant, and *prosecute or defend*, as the case may be, *any and all suits*, civil or criminal in the [S]upreme [C]ourt of the United States, in the United States court of appeals for the judicial circuit of the United States comprising the state of Tennessee, or in any of the district courts of the United States held in the state of Tennessee, in which suit or suits the *state may be a party*, or in which the *state has or may have interests of a pecuniary nature*.

Tenn. Code Ann. § 8-6-110 (emphases added).  In interpreting statutory language, Tennessee courts look to the "natural and ordinary meaning" of statutory language in the context of the entire statute and interprets the statute to effectuate the legislative intent.  *Potter*, 61 S.W.3d at 350.  Tennessee courts have concluded that similar language in other statutes created a duty upon

---

**12**The Tennessee Attorney General "became a constitutional officer with the adoption of the 1853 amendments to the Constitution of 1835." *Medicine Bird Black Bear White Eagle*, 63 S.W.3d at 772.

state officials.  *See Dobbins v. Crowell*, 577 S.W.2d 190, 192–93 (Tenn. 1979) (concluding that statutory language vested duty and authority to enforce solely in the Attorney General); *Potter*, 61 S.W.3d at 350–51 (citing Tenn. Code Ann. § 8-7-103, which states that district attorneys general "shall prosecute" and concluding that this "place[s] a duty upon the district attorney general").  It appears that Tennessee has selected the Attorney General as the exclusive representative of its interests in federal court.  *See* Tenn. Code Ann. § 8-6-110.

The General Assembly contends that, should we hold that it lacks the authority to sue in the name of the state, we would effectively give the Attorney General a veto over the General Assembly's powers to litigate.  The difficulty with this argument is that the General Assembly has not identified any Tennessee authority granting it the power to initiate a case on behalf of the state.  Tenn. Code Ann. § 8-6-109, which sets forth the duties of the Attorney General, does permit the Attorney General to "exercise discretion to defend the constitutionality and validity of all private acts and general laws of local application enacted by the general assembly and of administrative rules or regulations of this state."  *Id.* (b)(10).  If the Attorney General chooses not to defend a law, then he must certify that decision to the Speaker of each House of the General Assembly.  *Ibid.*  Upon such certification, the "speakers, acting jointly, may employ legal counsel to defend the constitutionality of such law."  *Id.* (c).  But, as the district court observed, this statute is not applicable because the Attorney General chose not to file suit against the federal government, rather than choosing not to defend the constitutionality of some law that the General Assembly enacted.  *Tennessee*, 329 F. Supp. 3d at 616.  The General Assembly's argument, that affirming the district court would nullify Tenn. Code Ann. § 8-6-109(c) and similar statutes in other jurisdictions incorrectly assumes that a suit to *defend* the constitutionality of *state* law is the same as the authority to *initiate* a suit to challenge *federal* law.  We note that Tennessee has not passed any substantive law that would affect the refugee Medicaid controversy.

Finally, we observe that, even when litigation implicates the General Assembly's constitutionally granted power to raise and spend funds, the General Assembly still does not have the authority to bring suit in the name of the state.  *See* Tenn. Code Ann. § 8-6-109(e).  The Attorney General is required to notify the General Assembly when the state is a party in state or

federal court and the litigation may raise issues of potentially insufficient funding or might result in increased state expenditures. *Id.* (b)(11)–(12), (d). In such a case, the Speakers of the General Assembly may employ legal counsel to offer advice, "provided[] that the attorney general and reporter shall remain the state's sole representative in federal and state court proceedings." *Id.* (e). Tennessee has designated an agent to represent its interests in federal court—and that agent is not the General Assembly. *See* Tenn. Code Ann. § 8-6-110; *Bethune-Hill*, 139 S. Ct. at 1952 ("[T]he House's argument that it has authority to represent the State's interests is foreclosed by the State's contrary decision.").

The General Assembly also relies on SJR 467 and the Slatery Letter to support its argument that has authority to bring suit on behalf of the State. In the Slatery Letter, the Attorney General declined to file suit, and then stated that, "to the extent allowed by Tennessee law," he delegated his constitutional and statutory authority "to commence litigation on behalf of the State of Tennessee to staff counsel for the General Assembly for the limited purpose of pursuing litigation to address the issues raised in SJR 467 in the manner provided for by SJR 467." Slatery Letter, at 4. He cited Tenn. Code Ann. § 8-6-302 to support this delegation. *Ibid.*

The Attorney General may delegate his statutory and constitutional authority only if authorized by statute or the Tennessee Constitution. *See* Tenn. Const. art. II, § 2 ("No person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted."); *Medicine Bird Black Bear White Eagle*, 63 S.W.3d at 772. There does not appear to be any constitutional provision permitting this delegation.[13] Tenn. Code Ann. § 8-6-302 provides that the Attorney General, with "the concurrence of the head of the executive agency involved, may permit, by express written authorization," staff attorneys of "various departments, agencies, boards, commissions or instrumentalities of the state to appear and represent the state" in a case "under

---

[13]The General Assembly contends that, as the injury to the state it alleges primarily implicates legislative powers, it is the proper party to file suit in the name of the state. The sole support it offers for this proposition is Tenn. Const. art. II, § 3, which vests the General Assembly with *legislative* authority. The legislative power encompasses the authority to make and repeal laws. *See Tennessee v. Brackett*, 869 S.W.2d 936, 939 (Tenn. Crim. App. 1993). Executive power concerns itself with the administration and enforcement of the law, and the judicial power centers on the authority to interpret and apply the law. *Ibid.* The Tennessee Constitution forbids one branch of government from taking on the duties of another branch without constitutional authorization. Tenn. Const. art. II, § 2. We do not find the General Assembly's argument on this point persuasive.

the direction and control of the attorney general and reporter." This statute does not appear to support the Attorney General's purported delegation for two reasons. First, the preceding code section, Tenn. Code Ann. § 8-6-301(c), expressly states that the Attorney General "shall not" represent the Office of Legal Services for the General Assembly[14] "before the [G]eneral [A]ssembly or any committee thereof, nor shall direct or supervise such office or attorneys employed by such office." Therefore, Tenn. Code Ann. § 8-6-302 cannot apply to the General Assembly's staff attorneys because they cannot operate under the Attorney General's direction. *See Tennessee v. Allman*, 68 S.W.2d 478, 479 (Tenn. 1934) ("It is, of course, well settled that statutes forming a system or scheme should be construed so as to make that scheme consistent in all its parts.").

Second, the statute only applies to executive agencies. *See* Tenn. Code Ann. § 8-6-302 (requiring "the concurrence of the head of the executive agency involved" before the staff attorney may "appear and represent the state"). The preceding sections, Tenn. Code Ann. § 8-6-301(a)–(b), emphasize the Attorney General's authority over executive agencies, and forbid these agencies from initiating civil proceedings, except through the Attorney General. *Id.* (b). The General Assembly argues that it would be "inappropriate, as a matter of federalism, for a federal court to assume that the State's Attorney General made such a delegation if he could not lawfully do so." But the statute the Attorney General relied upon to support his delegation is, by its own terms, inapplicable to the present circumstances, and the General Assembly has not identified any other statutory or constitutional provision that would permit the Attorney General to do so—instead the General Assembly pins its hopes on SJR 467.

The State Department argues that, as "a resolution is not law and cannot amend a statute," SJR 467 did not create a new statutory authorization permitting the General Assembly to initiate an action on behalf of Tennessee in federal court, or amend Tenn. Code Ann. § 8-6-110, which currently identifies the Attorney General as the state agent with the exclusive authority to do so. In *Vertrees v. State Bd. of Elections*, 214 S.W. 737, 742 (Tenn.

---

[14]The Office of Legal Services for the General Assembly has a number of statutory duties, but none of them include filing suit on behalf of the state. *See* Tenn. Code Ann. § 3-12-101 (listing duties of the Office of Legal Services). The General Assembly has not argued that Tennessee law authorizes the Office of Legal Services to undertake this action on behalf of the state.

1919), the Tennessee Supreme Court considered, among other issues related to women's partial suffrage in Tennessee, whether elections officers had the power to provide a separate ballot box for women's votes. The court concluded that, as a statute authorized the elections officers to provide a ballot box, it implied the power to provide other boxes, if it was necessary for a fair election. The court also noted a resolution passed by the General Assembly that stated that elections officers *could* provide separate ballot boxes. *Ibid.* The court explained that such a resolution "was not effective to confer any additional power on our election officers, or to amend any existing law." *Ibid.* Instead, it served as "an expression of the opinion of the Legislature and as an expression of legislative advice." *Ibid.* The General Assembly, which has the burden of establishing standing, *see Spokeo*, 136 S. Ct. at 1547, has not offered any Tennessee precedent demonstrating that a resolution is effective to alter existing statutory schemes.[15] While the General Assembly may have the authority to sue in its own name in federal court to vindicate an injury to its own rights, provided it can satisfy the essential jurisdictional requirements, we conclude that SJR 467 did not amend the Tennessee law that provides that the Attorney General has the exclusive responsibility to litigate on behalf of the state in federal court. *See* Tenn. Code Ann. § 8-6-110.

---

[15]There is some dispute over whether SJR 467 was even validly enacted. The General Assembly maintains that, as SJR 467 "was passed by majorities in each house of the General Assembly and returned by Governor Haslam without a veto," it became "effective pursuant to Section 18 of Article III of the Tennessee Constitution." The State Department disagrees. It points out that the Governor did not sign SJR 467, and included a statement describing why he chose not to sign the resolution, including that he had "constitutional concerns about one branch of government telling another what to do."

The Tennessee Constitution provides that bills and joint resolutions that pass the General Assembly must be presented to the Governor for his signature. Tenn. Const. art. III, § 18. If the Governor refuses to sign a bill or joint resolution and wishes to veto it, he must return the document to the General Assembly with his written objections within ten calendar days, not counting Sunday, or it becomes law without his signature. *Ibid.* If he returns the resolution with objections, "before it shall take effect [the resolution] shall be repassed by a majority of all the members elected to both houses in the manner and according to the rules prescribed in case of a bill." *Ibid.* The General Assembly sent SJR 467 to the Governor on May 9, 2016. He returned it without a signature and with objections on May 20, 2016. *See* Tenn. Legislative Record, 109th Gen. Assembly, at 16–17 (Nov. 2016). Excluding the Sunday, this return appears to be timely. The General Assembly never repassed SJR 467. In *Johnson City v. Tennessee Eastern Electric Co.*, 182 S.W. 587, 590 (Tenn. 1916), the Tennessee Supreme Court concluded that it is "[b]eyond question a return made by the Governor of a bill with his objections thereto in writing to the committee on enrolled bills of the house of origin, or to any member thereof, would be a good return of the bill and objections within the meaning of the Constitution." We do not need to address this issue because the Attorney General has the sole authority to litigate in federal court on behalf of the state, Tenn. Code Ann. § 8-6-110, and there does not appear to be any precedent to support his delegation to the General Assembly. Further, *Vertrees v. State Board of Elections*, 214 S.W. 737, 742 (Tenn. 1919), undercuts the General Assembly's argument that SJR 467 has altered Tennessee statutory or constitutional law in a way that would permit it to sue.

Because the General Assembly has not established that it has standing, there is no subject-matter jurisdiction. *See Spokeo*, 136 S. Ct. at 1547; *Steel Co.*, 523 U.S. at 94. "Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868). Accordingly, we do not reach the questions of ripeness, statutory preclusion, or whether the General Assembly stated a claim upon which relief could be granted. *See Coal Operators & Assocs., Inc.*, 291 F.3d at 915.

The judgment of the district court dismissing the case for lack of standing is AFFIRMED.